699 So.2d 16 (1997)
STATE of Louisiana
v.
Adam COMEAUX.
No. 93-KA-2729.
Supreme Court of Louisiana.
July 1, 1997.
Rehearing Denied September 5, 1997.
*18 R. Neal Walker, W. Keith Hurtt, Jr., New Orleans, for Applicant.
Richard Ieyoub, Atty. Gen., Earl Cox, Jerry L. Jones, Monroe, for Respondent.
LEMMON, Justice.[*]
This is an appeal from a sentence of death, which was imposed after a second sentencing hearing.[1] The principal issues are (1) whether the evidence of unrelated and unadjudicated criminal conduct presented by the prosecutor in the case-in-chief in the penalty phase, although admissible under State v. Jackson, 608 So.2d 949 (La.1992), injected an arbitrary factor into the proceeding in violation of defendant's due process rights, and (2) whether the execution of an offender who is both young and mentally retarded violates the prohibition against excessive punishment in the Louisiana Constitution.[2]

Facts
The victims were two sisters, sixty-three-year-old Ida Voiselle and seventy-two-year-old Ruby Voiselle Smith, who lived in Alexandria. A third sister requested the police to check on them after they failed to respond to telephone calls and knocking on their door.
Upon arrival, the police found bloodstains on the rear door, a side window screen torn and removed, and a broken window pane with pieces of glass on the ground. There was blood on the pieces of the broken glass pane still attached to the window. In the dining room, they found Voiselle's body, face down in a pool of blood. A short distance away, in a bedroom next to the bed, they found the almost completely nude body of Smith, lying face up in a pool of blood.
At about 6:30 a.m. on the day of the murder, a cab driver drove defendant from a bus station near the crime scene to another bus station, which was closed. Defendant then requested to be driven to Opelousas. The driver noticed that defendant had four cut marks on his lower right arm and appeared very nervous, continually looking behind the cab during the trip. Upon arriving in Opelousas, defendant asked the driver to take him to his home in Leonville.
Later that night, the cab driver, after hearing of the murders, notified the police of the details of the trip to Leonville. The next day, the driver led police officers to the residence where he had taken defendant. Upon locating defendant, the police requested that he come with them to headquarters, which he agreed to do.
Advised of his rights and that he was not under arrest and free to go at any time, defendant signed a rights waiver form and gave a recorded statement concerning the two homicides. In the vague statement, he admitted breaking into the house and hitting the two women. Defendant was then arrested.
Two days later, defendant, after again being advised of his rights, signed another rights waiver form and gave a detailed statement concerning the two murders. In a lineup later that morning, the cab driver positively identified defendant as the person he had taken to Leonville.
*19 A pathologist determined that the cause of death for both victims was multiple traumatic injuries to the head and body received as the result of a beating with a heavy, blunt object (later determined to be a cypress knee doorstop), resulting in shock and rapid blood loss. Additionally, Smith's body revealed evidence of recent intercourse, ejaculation, and trauma to the genitalia.
Testing of rape kits revealed that the rapist was a Type O non-secretor, as was defendant. Hair samples found on Smith's body and at the scene possessed the same characteristics as defendant's hair.
Blood samples taken from an oil drum that was used to gain access to the window and from a metal cabinet near the window were determined to be consistent with defendant's blood type and characteristics. Latent fingerprints lifted from the broken glass on the window pane and from the dryer matched defendant's fingerprints. Finally, footprints found in the pool of blood surrounding Voiselle's body exactly matched one from a pair of tennis shoes seized from defendant.
As noted, the first trial resulted in a conviction of first degree murder and a sentence of death, but the sentence was reversed. At the second penalty hearing, the prosecutor presented, in addition to the evidence relating to the murders of the two sisters, evidence of the following unrelated crimes:
1. A similar rape and murder of an elderly woman in Hot Springs, Arkansas, which occurred a week prior to the murders in this case and had not been adjudicated;
2. An aggravated burglary in Lake Charles two years before the murder, which had not been adjudicated; and
3. An attempted forcible rape committed three years earlier when defendant was fourteen years old and for which defendant was adjudicated delinquent.
After hearing mitigating defense evidence of defendant's youth at the time of the offenses and of his mental retardation, the jury unanimously recommended the death penalty for each murder. As statutory aggravating circumstances in each case, the jury found that the offense was committed during the perpetration or attempted perpetration of an aggravated burglary; that the defendant knowingly created a risk of death or great bodily harm to more than one person; and that the offense was committed in an especially heinous, atrocious, or cruel manner. As to the Smith murder, the jury also found that the offense was committed during the perpetration or attempted perpetration of an aggravated rape. The trial judge sentenced the defendant in accordance with the jury's recommendation.

Evidence of Character and Propensities
La.Code Crim. Proc. art. 905.4 provides a list of statutory aggravating circumstances, and La.Code Crim. Proc. art. 905.3 requires the jury to find beyond a reasonable doubt the existence of at least one statutory aggravating circumstance in order to recommend imposition of the death sentence. One of the statutory aggravating circumstances is that "[t]he offender has been previously convicted of an unrelated murder, aggravated rape, aggravated burglary, aggravated arson, aggravated escape, armed robbery, or aggravated kidnapping." La.Code Crim. Proc. art. 905.4(3).
The Code neither authorizes nor prohibits the admission of evidence of a conviction of any unrelated crime other than those listed in Article 905.4(3). Nor does the Code authorize or prohibit the admission of evidence of any unrelated criminal conduct for which there has not been an adjudication of guilt. The only Code reference to the admissibility of evidence in a capital sentencing hearing is La.Code Crim. Proc. art. 905.2, which authorizes admission of the evidence introduced in the guilt phase and evidence of aggravating and mitigating circumstances. However, Article 905.2 also provides that "[t]he sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the impact that the death of the victim has had on the family members." (emphasis added).
In State v. Sawyer, 422 So.2d 95 (1982), this court addressed the issue of whether the prosecutor in the case-in-chief in a capital sentencing hearing may introduce evidence of a conviction of unrelated crimes other than those specifically enumerated as aggravating *20 circumstances in Article 905.4(3). Rejecting the argument that such evidence is evidence of the defendant's character which may be introduced only if the defendant places his character at issue, this court held that "the defendant's character is at issue, and indeed is one of the principal issues" in the capital sentencing hearing under Article 905.2. 422 So.2d at 104 (emphasis in original). See also State v. Jordan, 440 So.2d 716 (La.1983).
In State v. Hamilton, 478 So.2d 123 (La. 1985), this court recognized that due process requires pretrial notice to the defense of the prosecutor's intention to introduce evidence at the penalty hearing of other crimes committed by the defendant.
In State v. Ward, 483 So.2d 578 (La.1986), this court addressed the issue of whether the prosecutor in the case-in-chief in the capital sentencing hearing may introduce evidence of the defendant's unrelated criminal conduct for which no conviction has been obtained. The court approved the introduction of prior convictions of attempted burglary, misdemeanor rape, third degree assault, unlawful sexual intercourse with a minor (defendant's sister-in-law), and cruelty to a juvenile (defendant's daughter), as well as evidence of various sexual encounters between the defendant and his wife's relatives and of beatings administered by defendant upon his wife and her brother. The court concluded that the overall evidence, consisting of both convictions and unadjudicated conduct, portrayed an entire family that was either physically or sexually abused by the defendant, so that there was no surprise, undue prejudice, or arbitrary factor injected into the jury's deliberations. The concurring opinion suggested that the evidence of unadjudicated criminal conduct was admissible under proper safeguards similar to those used for other crimes evidence in non-capital cases.
In State v. Brooks, 541 So.2d 801 (La. 1989), this court approved the introduction in the case-in-chief in the penalty phase of a capital sentencing hearing of two unrelated and unadjudicated murders, holding that evidence of unadjudicated crimes may be relevant and helpful to the jury in determining the appropriate sentence. The court stated that such evidence is admissible once the trial judge determines: (1) that the evidence of the defendant's commission or connection with the commission of the unrelated criminal conduct is clear and convincing; (2) that the proffered evidence is otherwise competent and reliable; and (3) that the unrelated conduct has relevance and substantial probative value as to the defendant's character and propensities.
Because of the legislative silence on the admission of unrelated and unadjudicated criminal conduct in a capital sentencing hearing, there were no limitations on this type of evidence when the admissibility was established in Ward and Brooks. Recognizing the evident need for such limitations, this court granted certiorari at the pretrial stage in State v. Jackson, 608 So.2d 949 (La.1992), and established significant limitations. The most significant limitation was the rule that the evidence of the unadjudicated criminal conduct must involve violence against the person of the victim for which the period of limitation for instituting prosecution had not run at the time of the indictment of the accused for the capital offense for which he or she is being tried. As to delinquency adjudications when the accused was a juvenile, this court limited admissibility to those adjudications which were based on an offense that would have been a felony if committed by an adult. As to evidence of unadjudicated conduct as a juvenile, the court further limited admissibility to evidence of those crimes enumerated in La. Children's Code arts. 305 and 857. The court noted that these limitations were necessary "in order to insure that due process is not violated by the injection of arbitrary factors into the jury's deliberations and to prevent a confusing or unmanageable series of mini-trials of unrelated and unadjudicated conduct during the sentencing hearing." Id. at 955.
The court in Jackson also reiterated its holding in Hamilton that pretrial notice to the defense of the prosecutor's intention to use evidence of unrelated convictions or of unrelated criminal conduct is necessary in order to insure the defense an opportunity to prepare to rebut or defend against this evidence.
*21 Applying the limitations of Jackson, this court in State v. Bourque, 622 So.2d 198 (La.1993) held that evidence of an unrelated and unadjudicated killing, committed one hour before the murder at issue in the capital case being tried, was admissible, since it was relevant evidence of Bourque's character and propensities and fell within Jackson's limitations.[3] However, a majority of the court reversed the death sentence on the basis that the prosecutor "presented a prohibited `mini-trial' on the issue of the defendant's guilt or innocence of the killing of Jasper Fontenot," the unrelated and unadjudicated conduct. Id. at 248. Of the twelve prosecution witnesses in the penalty phase, eleven testified about the unrelated killing. Four eyewitnesses testified that the defendant shot Fontenot, and the other witnesses testified as to the chain of custody of physical evidence. The coroner also testified as to the cause of Fontenot's death, furnishing an autopsy photograph. In reversing the sentence, the court stated:
Introduction of evidence beyond that necessary to show criminal conduct has been committed and that the defendant has been accused of or connected to that criminal conduct, as well as some minimal evidence in support of these allegations, impermissibly shifts the focus of a capital sentencing jury from considering the character and propensities of the defendant to a determination of guilt or innocence of the unadjudicated criminal conduct.
Id. at 248.
The instant case, which was tried before the Bourque decision was rendered, presents an opportunity for this court to offer guidance to the lower courts, as well as to prosecutors and defense attorneys in capital cases, for avoiding reversible error in the presentation of evidence of unadjudicated criminal conduct.
At the outset, it is important to note that the judge, and not the jury, determines the admissibility of the evidence of unrelated criminal conduct by determining whether the defendant's commission or connection with the commission of the criminal conduct was proved by clear and convincing evidence[4] and whether the unrelated conduct has relevance and substantial probative value as to the defendant's character and propensities. The judge preferably should make this determination at a pretrial hearing, but certainly at a hearing outside the presence of a jury, whether before or during the trial. At that hearing, the judge determines the admissibility of evidence of the unadjudicated criminal conduct, not only in accordance with the standards in the Brooks decision, but also in accordance with the further limitations in the Jackson decision.
The Bourque decision limited the amount of admissible evidence that the prosecutor may introduce in the case-in-chief of the penalty phase, holding that anything beyond "minimal evidence" of the unadjudicated criminal conduct impermissively shifts the focus of the capital sentencing jury from the character and propensities of the defendant to the determination of the guilt or innocence of the defendant with respect to the unadjudicated criminal conduct. On reconsideration, we now overrule the Bourque decision.
The injection of arbitrary factors into the penalty phase of a capital trial can violate the defendant's due process rights. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Arbitrary factors are those which are entirely irrelevant or so marginally relevant to the jury's function in the determination of sentence that the jury *22 should not be exposed to these factors; otherwise, the death penalty may be imposed "wantonly or freakishly" or for discriminatory reasons. Id. at 207, 96 S.Ct. at 2941.
Just as the Supreme Court of the United States in Gregg established safeguards (such as the finding beyond a reasonable doubt of at least one statutory aggravating circumstance) necessary for the valid imposition of a death sentence, this court has established significant safeguards against the wanton and freakish imposition of capital punishment when the prosecution offers evidence of unrelated and unadjudicated criminal conduct. First, the prosecutor must provide notice of its intention to use such evidence well in advance of trial. Second, the trial court must conduct a hearing outside the presence of the jury to determine the admissibility of the evidence under Brooks. If, for example, the evidence of the defendant's guilt is only marginal, the evidence is excluded by the clear and convincing standard. Finally, the Jackson decision established further limitations based on the violent nature and the temporal relationship of the conduct, thereby excluding evidence that is only marginally relevant to the jury's sentencing function.
Bourque's further limitation on the amount of admissible evidence, no matter how highly relevant to the defendant's character and propensities, was unnecessary to guarantee due process. The thrust of the Jackson decision was not to exclude any evidence that was significantly relevant to the defendant's character and propensities, no matter what the amount of the evidence was, but rather to maintain the jury's focus on their function of deciding the appropriate penalty by eliminating marginally relevant evidence that does not aid the jury in performing this function.
Because the judge, as mandated by Brooks and Jackson, excludes from the jury's consideration anything less than clear and convincing evidence of guilt of the unadjudicated criminal conduct, as well as any evidence of stale conduct or of minor criminal conduct only marginally relevant to capital sentencing considerations, the question of the defendant's guilt or innocence of the unadjudicated conduct[5] generally will not be a disputed issue. In most cases, the jury will be concerned primarily with the effect of that conduct on its evaluation of the defendant's character and propensities. Perhaps an overabundant amount of evidence of significant unadjudicated criminal conduct, and especially a large amount of minute details of that conduct, could reach a point where the jury's attention is improperly shifted. However, we emphasize in this case that the question of whether otherwise admissible evidence of unrelated and unadjudicated criminal conduct (the admissibility of which has already been subjected by this court to significant limitations) injects an arbitrary factor into a capital sentencing hearing is one to be decided on a case-by-case basis, and we strive to provide some guidelines for making the determination.
Evidence that establishes the defendant in the recent past has engaged in criminal conduct involving violence to the person is highly probative of the defendant's character and propensities. Such evidence generally would not inject an arbitrary factor into a capital sentencing hearing, especially when the conduct involves the same or similar crime committed in a similar manner. On the other hand, the type of evidence that tends to inject arbitrary factors into a capital sentencing hearing usually is evidence which is of only marginal relevance to the jury's determination of the character and propensities of the defendant.[6]
As noted above, a large amount of highly relevant evidence usually will not result in the injection of an arbitrary factor into the capital sentencing hearing, although arguably there may reach a point where the sheer magnitude and details of the evidence, although highly probative, impermissively shifts the jury's focus from its primary functions *23 of determining the appropriate sentence for this offense and this offender. For this reason, the judge in the capital sentencing hearing should exclude evidence which, because of its cumulative or repetitive nature, has only marginal relevance and probative value. Moreover, the judge, having already ruled at the pretrial hearing on the admissibility of evidence of the unadjudicated conduct, should cautiously consider the quantum of evidence necessary to convey the message to the jury that the defendant has engaged in other serious criminal conduct that the jury should consider in its determination of sentence, without shifting the jury's focus from its function of determining the appropriate sentence in the capital case to a focus on the defendant's involvement in other unrelated criminal conduct.[7]
We now proceed to examine the evidence of the three instances of unrelated and unadjudicated criminal conduct presented in the present case.
1. The Arkansas Killing
In the present case, the trial judge at a pretrial hearing correctly ruled that the evidence of the Arkansas killing met the Jackson standards and was admissible. The critical question is whether the sheer volume of such evidence introduced by the prosecution injected an arbitrary factor into the capital sentencing hearing.
Seven witnesses (including one who also testified regarding the instant murder), of the twenty-three prosecution witnesses in the penalty phase, testified concerning the Arkansas killing. The testimony of the first six witnesses was very brief. These witnesses were presented consecutively, after completion of the evidence relating to the murders of the two sisters.[8]
An Alexandria policeman testified (in five pages of transcript) that he sent a teletype to every police station in the nation describing the murders and the 3-14 person arrested. In response to an Arkansas request for fingerprints, the officer questioned defendant about the Arkansas murder, and defendant confessed to the rape and murder of an elderly woman in Arkansas. The confession was played to the jury.
An Arkansas Jobs Corps instructor testified (in five pages of transcript) that defendant, at the time of the murder, was in training at a local facility with a bus stop near the victim's home.
Based on a brief foundation (five pages of transcript) laid by an Arkansas chief of detectives, a fingerprint expert (in eleven pages of transcript) identified defendant's fingerprints on a Vaseline jar that contained a single pubic hair and his palm prints on the outside walls of the house, near a broken kitchen window through which the murderer gained entry into the house.
An Arkansas policeman (in eleven pages of transcript) described the body and the murder scene, displaying photographs of the scene without objection by the defense. Another witness, whose mother was a close friend of the victim, began to offer identification testimony, but was dismissed (after three pages of transcript) when the parties reached a stipulation.
The principal witness concerning the Arkansas murder was the coroner, who described the autopsy process.[9] He also described the multiple traumatic injuries found on the body, including a broken nose and *24 cracked skull, as well as scratches on the genitals and bruises on the thighs that indicated a violent attempt to spread the legs apart.
We conclude that the evidence of the Arkansas murder did not inject an arbitrary factor into the proceeding. The testimony of the coroner was highly relevant because it was so highly probative of defendant's propensity to rape and brutally murder elderly women. The description by the Arkansas policeman of the murder scene and the method of entry was highly probative of the similarity between the offense on trial and the Arkansas murder as to the method of entry and the carrying out of the rape and murder. The testimony of the Alexandria policeman was necessary to lay the foundation for introduction of the confession. The testimony of the three identification witnesses and of the Job Corps instructor arguably was unnecessary because of the confession. See State v. Hamilton, 92-1919 (La.9/5/96); 681 So.2d 1217. However, the defense had challenged the confession to the Arkansas murder on the basis that defendant was incapable of making a voluntary confession because of his mental retardation, and the prosecutor may have deemed the evidence necessary, at least until the defense offered no objection when the confession was introduced. In any event, these four witnesses testified only very briefly, and their testimony did not include any factors that were improper for the jury's consideration.
In summary, several of the witnesses presented evidence regarding the Arkansas murder that was highly relevant to the defendant's propensity to commit such gruesome crimes. While perhaps four of the witnesses were unnecessary, their testimony was simple and unconfusing, and was hardly likely to create prejudice. The testimony of each witness clearly did not, by itself, inject an arbitrary factor into the proceeding. Finally, when the entirety of the evidence regarding the Arkansas murder is considered, the evidence for the most part was highly relevant, and the remainder was not of such a nature as to inject an arbitrary factor into the jury's deliberation by substantially diverting the jury's focus from its primary function of deciding the appropriate penalty for the crime for which defendant was being tried.
2. The Lake Charles Aggravated Burglary
Two years before the murder of the two sisters, defendant broke into the kitchen window of a home at night. According to the female occupant, defendant chased her into the living room and knocked her down several times as she tried to escape through the front door. When the victim's son grabbed a knife from the kitchen and threatened him, defendant ran outside and vanished.
The victim went to the bus station next door to call the police, and the ticket agent informed her that a man fitting the description of the burglar had just gone into the restroom. The police arrived quickly and arrested defendant, but he was never prosecuted.
The evidence falls within the Jackson limitations. The testimony of the three witnesses (covering a total of twenty-one pages of transcript) provided clear and convincing proof of an aggravated burglary, a crime listed in La. Children's Code art. 305 and 857.[10] The conduct also fell within Jackson's time limitations. Finally, the evidence of criminal conduct similar to the aggravated burglary in the murder of the two sisters, was highly probative of defendant's character and propensities, and did not inject an arbitrary factor into the capital sentencing hearing.
3. The Juvenile Delinquency Adjudication
Three years before the murder of the two sisters, defendant forced his way into the victim's home in Arnaudville by threatening her with a knife. Defendant ordered the victim to remove her clothes, but she ran into the kitchen and threw the contents of a jar of olives into his face when he lunged at her with the knife. Defendant ran off, but was *25 immediately apprehended by the police while running along the highway to Leonville.
At the capital sentencing hearing, the prosecutor introduced a certified copy of the minutes of the juvenile court, indicating that defendant had been adjudicated a delinquent through a stipulation of counsel that he attempted to commit a forcible rape of the victim.[11] This evidence falls within the Jackson limitations.
Moreover, while Jackson prohibits evidence of the original charge when the conviction was for a lesser offense, the testimony of the victim (which proved an aggravated burglary by clear and convincing evidence) was not evidence of an original charge, and there was no indication of a conviction of a lesser offense. The Jackson requirement was designed to exclude evidence of a possible overcharge in the original charging instrument when the jury returned a verdict of guilty of a lesser charge. The evidence in the present case does not violate that prohibition.
Finally, the testimony of the victim and the two arresting officers (covering twenty-seven pages of transcript) did not inject an arbitrary factor into the proceeding.

Excessive Punishment
The defense filed a pretrial motion to quash the indictment, arguing that the death penalty, as applied to this youthful and mentally retarded offender, violated La. Const. art. I, § 20, which prohibits cruel, unusual and excessive punishment. The trial court denied the motion after a hearing.
Defendant, who was seventeen years old and mildly mentally retarded at the time of the crime, argues that the right to humane treatment under the Louisiana Constitution prohibits the execution of an offender who was both young and mentally retarded at the time of the offense. Defendant also asserts that an open question exists under the federal constitution as to whether capital punishment may be considered for an offender who was both young and mentally retarded at the time of the offense.
Defendant concedes that imposition of the death penalty on a youthful offender (above the age of fifteen)[12] or on a mentally retarded offender is not alone violative of federal constitutional law, as long as the jury has had the opportunity to consider those mitigating circumstances in its deliberations. In Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the Court addressed the issue of whether the Eighth Amendment prohibition against cruel and unusual punishment was violated by execution of a defendant who had an IQ of between fifty and sixty-three, which classified him as mildly to moderately retarded. Penry was twenty-two years old at the time of the crime, but had a mental age of six and one-half years, and his social maturity was equal to nine or ten years of age. The Court concluded that the Eighth Amendment does not prohibit execution of a mentally retarded offender of Penry's ability by virtue of his mental retardation alone. As long as "the sentencer [can] consider and give effect to [mitigating evidence of mental retardation] in imposing sentence," an individualized assessment of the appropriateness of the death penalty may be made. Penry, 492 U.S. at 319, 109 S.Ct. at 2947.
In Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), the Court concluded that imposition of capital punishment on an individual for a crime committed at sixteen or seventeen years of age does not constitute cruel and unusual punishment under the Eighth Amendment.[13]
In Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Court concluded:

*26 [T]he Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. (emphasis in original).
On the other hand, the Court in Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) reversed the death sentence because the jury considered the offender's youthfulness at the time of the crime, but was not allowed to consider mitigating evidence of the defendant's family history. Eddings was sixteen years old at the time of the crime, and his mental and emotional development were at a level several years below his chronological age. The Court held that "just as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered in sentencing." Id. at 116,102 S.Ct. at 877.
The jury's consideration of mitigating factors is required in order to assure that the jury will impose an individualized sentence in a capital case, where the jury's attention is focused on the characteristics of the person who committed the crime as well as the circumstances of the offense. The fact that the defendant's characteristics may supply more than one mitigating factor does not require a conclusion that the death penalty is an unconstitutional punishment, as long as a jury is allowed to consider all of the evidence in mitigation. Therefore, when the jury is allowed to consider all mitigating circumstances presented by the defense and the defendant is unable to demonstrate that his mental deficiencies or youth rendered him incapable of acting at the level of culpability required for the imposition of the death penalty, there is no Eighth Amendment violation in imposing capital punishment.
The Louisiana Constitution, which contains a prohibition against "excessive" sentences, has an express protection not found in the federal constitution. In State v. Jones, 94-0459 (La.7/5/94); 639 So.2d 1144, 1154, this court stated:
[T]he prohibition against "excessiveness" proscribes punishment which does not make any measurable contribution to the goals the punishment is intended to achieve, or is grossly out of proportion to the severity of the crime... A punishment that is disproportionate to the offense and the offender is unnecessarily severe and, therefore, excessive per se. Thus, under LSA-Const. Art. I, Sec. 20, in addition to entitlement to heightened reliability of the capital sentencing process, the provision protects all defendants not only from punishments that are cruel, excessive or unusual per se or as applied to particular categories of crimes or classes of offenders, but also from any excessive feature of a particular sentence produced by an abuse of the sentencer's discretion, even though the sentence is otherwise within constitutional limits. (citations omitted, emphasis in original).
In capital cases, the required focus of the penalty phase is on the circumstances of the offense, the character and propensities of the offender, and the aggravating and mitigating factors. La.Code Crim.Proc. arts. 905.2 A, 905.4, and 905.5. This narrowed focus helps to ensure that a jury will individualize its sentencing recommendation, reserving capital punishment for only the worst type of offender.
Mitigating circumstances are presented by the defense to show aspects of the defendant's life or character which might lessen the defendant's culpability and persuade a jury that the proper penalty is life imprisonment. Youth and mental incapacity are two such mitigating factors, and both were presented as mitigation in defendant's favor here.
Mental retardation does not automatically invalidate consideration of capital punishment under La. Const. art. I, § 20. In State v. Mitchell, 94-2078 (La.5/21/96); 674 So.2d 250, cert. denied, ____ U.S.____, 117 S.Ct. 614, 136 L.Ed.2d 538 (1996), a capital defendant was classified as mildly retarded with an IQ range of between sixty-one and seventy-one. The defense introduced extensive evidence regarding Mitchell's *27 mental condition. This court noted that La.Code Crim.Proc. art. 905.5(e) specifically directs a jury to consider as mitigating evidence that, at the time of the offense, "the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication." Pointing out that the jury was able to consider this evidence in determining an appropriate penalty, this court concluded that neither the federal nor the state constitution precluded Mitchell's execution solely by virtue of his mental retardation.
Similarly, the defendant in State v. Prejean, 379 So.2d 240 (La.1979), cert. denied, 449 U.S. 891, 101 S.Ct. 253, 66 L.Ed.2d 119 (1980), who was eighteen years old at the time of the crime, was classified as borderline mentally retarded with a full scale IQ of seventy-six and a mental age of thirteen years, six months. The Prejean jury was allowed to consider this evidence and returned a capital verdict which was upheld by this court.
In State v. Brooks, 92-3331 (La.1/17/95); 648 So.2d 366, the defendant had a tested IQ range of forty-four to sixty-seven and was classified as either mildly to moderately retarded (at the higher end of the range) or moderately to severely retarded (at the lower end of the range). Although twenty years old at the time of the crime, Brooks' mental age was evaluated as between ten and twelve years old. However, he had learned to drive a car and could operate a forklift. Expert testimony was adduced that the IQ testing did not show the full range of Brooks' ability. Although his capital sentence was reversed on grounds unrelated to his mental capacity and it was unnecessary to address the issue of whether the execution of the mentally retarded offender would violate his constitutional rights, this court noted:
Brooks has made no showing that the degree of his mental impairment approaches that of Penry, has failed to demonstrate that his mental deficiencies rendered him incapable of acting at the level of culpability required for the imposition of the death penalty, and has failed to set forth any reasons why he is in any respect different from the large number of mildly retarded persons falling within his general psychological classification.
Id. at 377 n. 21.
In the present case, defendant, who was seventeen years old at the time of the murders, was mildly mentally retarded, and testing indicated an IQ of sixty-eight. However, he has made no showing that the degree of his mental impairment, when combined with his youth, rendered him incapable of acting at the level of culpability required for the imposition of the death penalty. The jury was aware of defendant's age and heard extensive expert testimony concerning his mental condition. The jury was instructed, pursuant to La.Code Crim. Proc. art. 905.5(e), to consider whether the mental disease or defect impaired his capacity to appreciate his criminal behavior or conform his conduct to that which is lawful. Based on these considerations, we cannot conclude that either the federal or state constitution precludes the execution of this particular defendant.

Capital Sentencing Review
Pursuant to La.Code Crim.Proc. art. 905.9 and La.Sup.Ct.R. 28, this court reviews every sentence of death to determine if it is constitutionally excessive. In making this determination, the court considers whether the sentence was imposed under the influence of passion, prejudice or arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
Defendant is a black male who was seventeen years old at the time of the murders. He is unmarried and has no children or other dependents. He is one of eight children. Defendant lived most of his life in Leonville until he was adjudicated delinquent in 1982 for attempted forcible rape. He went only to the seventh grade in school and was in a special education program.
Defendant's IQ is assessed as "low, between 67-71." A psychiatric evaluation revealed *28 that defendant is borderline mentally retarded and has the following behavior disorders: "conduct disorder, under-socialized, aggressive behavior." He had a history of violence in school. Although he is not psychotic or suffering from delusions or hallucinations, he does suffer from a "severe defective disorder."
His only apparent employment was with the Arkansas Job Corps, where he spent three months in 1985. He "went A.W.O.L." in August 1985 and was arrested shortly after the murders. The delinquency adjudication is the only reported criminal history.

1. Passion, Prejudice and Other Arbitrary Factors
Defendant argued that a number of matters injected arbitrary factors into the proceedings. The claims were treated under the individual assignments of error, either in this opinion or in the appendix.

2. Aggravating Circumstances
At trial, the prosecutor urged the existence of three aggravating circumstances, and the jury found all three as to both murders: (1) the offender was engaged in the perpetration or attempted perpetration of aggravated rape, aggravated kidnapping, aggravated burglary, or armed robbery; (2) the offender knowingly created a risk of death or great bodily harm to more than one person; and (3) the offense was committed in an especially heinous, atrocious or cruel manner.
The evidence presented at the sentencing hearing was clearly sufficient to support the jury's finding of the first aggravating circumstance. Sufficient evidence clearly established the rape of Ruby Smith. As to the aggravated burglary, defendant's intent to commit a felony before entering the victim's home was sufficiently clear from his recorded statement that "he wanted a woman."
The adequately supported finding of the existence of one aggravating circumstance is sufficient to uphold the death sentence, as long as the evidence introduced in support of other asserted aggravating circumstances did not inject an arbitrary factor into the sentencing hearing. State v. Sawyer, 422 So.2d 95 (La.1982). Evidence relating to the other asserted aggravating circumstances, whether or not proved (an issue we need not address), did not inject an arbitrary factor into the hearing.

3. Proportionality
Although federal constitutional law does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Welcome, 458 So.2d 1235 (La.1983). This court, however, has vacated only one capital sentence on grounds it was disproportionate to the circumstances of the offense and the character and propensities of the offender. State v. Sonnier, 380 So.2d 1 (La.1979).
Since 1976, three Rapides Parish juries (not including the jury in the defendant's original trial) have sentenced defendants to death. None of the prior cases closely resembles the present case. In State v. Moore, 432 So.2d 209 (La.1983), this court upheld the conviction and sentence of a defendant who kidnapped, robbed, and shot to death a convenience store manager. In State v. Felde, 422 So.2d 370 (La.1982), this court affirmed the conviction and sentence of a defendant who shot and killed a police officer who had just arrested him. In State v. Eaton, 524 So.2d 1194 (La.1988), this court affirmed the conviction and sentence of a defendant who planned and carried out the murder of a minister in order to steal her car. A review of these other capital verdicts from Rapides Parish reveals that defendant did not receive a disproportionately harsh sentence. The violence and depravity of the instant offense was at least as great as in the other capital verdicts.
A state-wide review of cases reflects that jurors often return the death penalty when an innocent adult victim has been robbed or raped and murdered in or near his or her home or car. See State v. Eaton, 524 So.2d 1194 (La.1988); State v. Kyles, 513 So.2d 265 (La.1987); State v. Wingo, 457 So.2d 1159 (La.1984); State v. Glass, 455 So.2d 659 (La. 1984); State v. Celestine, 443 So.2d 1091 *29 (La.1983); State v. Narcisse, 426 So.2d 118 (La.1983); State v. Moore, 414 So.2d 340 (La.1982). When these cases are compared to the present case, it cannot be said that the death sentence in this case is disproportionate.

Decree
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution, as provided by La.Rev.Stat. 15:567, until (a) defendant fails to petition the United States Supreme Court timely for certiorari; (b) that Court denies his petition for certiorari; (c) having filed for and been denied certiorari, the defendant fails to petition the United States Supreme Court timely, under their Prevailing rules, for rehearing of denial of certiorari; or (d) that Court denies his application for rehearing.
KIMBALL, J., concurs in result.
NOTES
[*] Judge Graydon Kitchens, Jr., 26th Judicial District Court, and Judge Ian W. Claiborne, 18th Judicial District Court, participating as associate justices ad hoc in place of Justice Jack C. Watson and Justice E. Joseph Bleich. Marcus, J., not on panel.
[1] On the appeal in defendant's first trial, this court affirmed the conviction of first degree murder, but reversed the death sentence and remanded for a new penalty hearing. State v. Comeaux, 514 So.2d 84 (La.1987).
[2] Defendant's other assignments of error involve only settled principles of law and are treated in an unpublished appendix, which is attached to this opinion and is a part of the official record.
[3] The unrelated killing was a crime of violence against the person and was committed within the time restrictions prescribed in Jackson.
[4] After the present case was taken under advisement, this court requested supplemental briefing on whether the enactment of La.Code Evid. art. 1104 affected the Brooks and Jackson standards for the admissibility of evidence of unadjudicated criminal conduct in a capital sentencing hearing. We now decline to address the issue for two reasons. First, Article 1104 was enacted in 1994, after the 1993 retrial of the penalty hearing in the present case, and both sides agree that the rules of evidence in effect at the time of trial were the applicable laws. Second, the prosecutor's evidence of unadjudicated criminal conduct met the clear and convincing standard, and any discussion of whether the enactment of Article 1104 lowered the standard for capital sentencing hearings clearly would be dicta.
[5] In both Bourque and the present case, there was no dispute about the guilt or innocence of the unadjudicated criminal conduct.
[6] That is the very reason the Jackson decision limited such evidence to that criminal conduct involving violence against the person, which has high probative value as to the propensity to commit first degree murder.
[7] The trial judge, at the pretrial hearing on the admissibility of the evidence of unadjudicated criminal conduct or at a later hearing outside the presence of the jury, should inquire into, and perhaps rule upon, the extent of the evidence that may be used. For example, if the defense does not intend to contest the defendant's guilt of the unadjudicated conduct, there is little need for the prosecutor to introduce chain-of-custody and detailed identification evidence. Under this procedure, the judge will have an opportunity to consider the arguments of both sides and can maintain better control on the focus of the penalty hearing.
[8] Because only the penalty phase was retried, the prosecutor had to present to the new jury much of the evidence that had been introduced in the guilt phase of the original trial. Eleven witnesses were called to present this evidence.
[9] The prosecutor proposed to show the autopsy photographs to the jury, but the trial judge ruled that only those photographs showing bruising of the legs would be admitted. The prosecutor decided not to introduce any of the autopsy photographs.
[10] Defendant's argument that he was arrested only for simple battery and burglary of an inhabited dwelling, crimes not listed in the pertinent sections of the Children's Code, is unavailing. The pertinent consideration is that the conduct constituted a listed offense.
[11] The minutes were of the disposition hearing and not of the adjudication itself, but clearly established the fact that defendant had been adjudicated delinquent, based on a crime of violence against the person.
[12] In Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), the Court held that the Eighth Amendment prohibited the execution of an offender who was fifteen years old at the time of the crime. See also State v. Stone, 535 So.2d 362 (La.1988).
[13] There were two consolidated cases. In one case, the defendant was seventeen years and four months old at the time of his offense. The defendant in the consolidated case was sixteen years and six months old at the time of his offense.