902 So.2d 440 (2005)
STATE of Louisiana
v.
Vincent T. STEWART.
No. 04-KA-1231.
Court of Appeal of Louisiana, Fifth Circuit.
April 26, 2005.
*442 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Andrea F. Long, Vincent Paciera, Jr., Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Prentice L. White, Louisiana Appellate Project, Baton Rouge, Louisiana, for Defendant/Appellant.
Vincent T. Stewart, Angola, Louisiana, in Proper Person.
Panel composed of Judges JAMES L. CANNELLA, THOMAS F. DALEY, and SUSAN M. CHEHARDY.
JAMES L. CANNELLA, Judge.
The Defendant, Vincent Stewart, appeals from his guilty plea to manslaughter and sentence of 15 years imprisonment at hard labor. For the reasons which follow we affirm and remand.
On January 31, 2002, the Defendant was charged by grand jury indictment with second degree murder, in violation of La. R.S. 14:30.1. On March 14, 2002, the Defendant entered a plea of not guilty. Thereafter, the Defendant filed two separate Motions to Suppress, one relative to incriminating statements and the other relative to identification. Following hearings on both motions, they were denied. The Defendant then withdrew his previous "not guilty" plea and entered a guilty plea under State v. Crosby,[1] to the offense of *443 manslaughter, La R.S. 14:31. The trial court sentenced the Defendant to 15 years imprisonment at hard labor. It is from this guilty plea conviction and sentence that the Defendant appeals. On appeal the Defendant presents five assignments of error, one counseled and four pro se.

COUNSELED ASSIGNMENT OF ERROR NUMBER ONE AND PRO SE NUMBERS ONE AND TWO.
By these assignments of error the Defendant argues that the trial court erred in denying his motion to suppress the statements that he made following his arrest. He argues that the State did not meet its burden of proving that his statements were knowing and voluntary when they were made, after he was subjected to nine hours of interrogation without the benefit of sleep.
The Defendant in his pro se brief argues that the State failed to demonstrate that he understood his rights at the time the third statement was given and that his waiver of rights prior to those statements was knowingly, intelligently, and voluntarily made. He also argues that the State failed to prove that he waived his rights to be interrogated regarding aggravated burglary as well as murder. The State responds that the trial court properly denied defendant's motion to suppress statements.
Sergeant Dennis Thornton of the Jefferson Parish Sheriff's Office (JPSO) testified at the hearing on the motion to suppress that the Defendant was picked up on outstanding attachments and brought to the detective bureau for questioning. He advised the Defendant that he was under investigation for murder and read the Defendant his rights using the JPSO rights of arrestee form.
The Defendant initialed each line of the form and signed it indicating that he understood his rights and was waiving them. He stated that he could read and write and had an eleventh grade education. The form was completed and signed on December 2, 2001 at 5:55 p.m. The first taped statement began at 6:05 p.m. and ended at approximately 6:25 p.m.
Sergeant Thornton testified that it appeared to him that the Defendant understood his rights, and that no one to his knowledge used any force, coercion, or intimidation, or made any promises in order to get the Defendant to waive his rights. He further indicated that, at no time during the questioning, did the Defendant state that he wished to stop speaking with him or that he wanted a lawyer.
In his first statement, the Defendant said that he picked up his friend, Titus White (White), the victim, at 11:00 p.m. at his house on Hooter Road. They rode around and went to clubs and he dropped off White at the EZ Serve near Hooter Road and Bridge City Avenue at approximately 2:30 or 3:00 a.m., where White was supposed to meet "Stacy." The Defendant stated that he did not have anything to do with White's death, that he was not near the location when White was killed, and that he did not know who killed White. He said that he was telling the truth and would take a polygraph.
Sergeant Thornton spoke to the Defendant again at approximately 6:35 p.m. on December 2, 2001, ten minutes after the first statement ended, and took a second taped statement from the Defendant. The second statement began at 6:35 p.m. and ended at 6:56 p.m. Sergeant Thornton testified that, although no additional waiver of rights form was executed, the Defendant indicated that he was going to give the second statement of his own free will based on the first form that was used.
In the Defendant's second statement, he said that, at approximately 2:30 to 3:00 a.m., he took White and "Leroy" to Jamie *444 Street in Avondale where they got out of the vehicle. White told the Defendant that he was going to Stacy's house and that it was alright if the Defendant left, so he did. The Defendant explained that he had a "bad feeling" when Leroy got out of the vehicle with White.
Sergeant Thornton took a third statement from the Defendant on December 3, 2001. Detective David Morales was present for that statement. The third statement began at approximately 1:15 a.m., approximately six hours after the second statement ended, and ended at 1:34 a.m. The Defendant remained in the interview room during the time between the second and third statements.
Sergeant Thornton explained that, during that time, the officers were verifying the Defendant's story, checking into information that the Defendant supplied in the first two statements, following up on leads, and performing other aspects of the investigation. He testified that, although the Defendant remained in the interview room during the time from the first statement through the third statement, he was allowed to use the restroom and get something to eat and drink.
In the Defendant's third statement, the Defendant stated that he and White met Leroy at a sports bar in Westwego. The Defendant said that they then went to White's house, and that White went inside his house and came out with a duffel bag containing latex gloves, a revolver, a ski mask, and some tape. After that, they went down the street, and White told Leroy to go check behind the house. When Leroy returned he had a shotgun.
The Defendant drove them to Jamie Street in Avondale and parked. Leroy and White put on the masks and gloves and jumped out of the vehicle with their guns. The Defendant stated that White told him he was going to a house because he had heard there was money and drugs inside. It was the Defendant's feeling that they were going to kill somebody.
Three minutes later, the Defendant saw Leroy run from the house dragging White's body. Leroy left White's body in the street and got into the vehicle. Leroy told the Defendant that he accidentally shot White because he thought White was a resident of the house. The Defendant wanted to get White's body, but Leroy told him to take him to Marrero or he would kill him. The Defendant brought Leroy to a house, saw Leroy go inside, and then left.
Detective Morales testified that on December 3, 2001 at approximately 3:30 p.m. he advised the Defendant of his rights using the JPSO rights of arrestee form, but that a statement was not taken from him at that time. The Defendant took a polygraph test on that day as well, which he did not pass. On December 4, 2001 at 3:30 p.m., Detective Morales advised the Defendant again of his rights using a JPSO rights of arrestee form. Detective Morales took a fourth statement from the Defendant beginning at 3:50 p.m. and ending at 3:57 p.m. He noted that he also took a statement from the Defendant between the third and fourth statements, but did not record it because he did not believe the Defendant.
In the Defendant's fourth statement, Detective Morales advised the Defendant that he was under arrest for murder and read him his rights. The Defendant stated that the night before he had taken the officers to a location in Marrero and pointed to a house where a man named "Frog" resided. The Defendant said that he had taken Frog and White to 112 Marie Drive in Avondale, that Frog and White went inside to burglarize the house, and that a *445 short time later he saw Frog carrying White's body into the street.
The Defendant explained that he had taken the officers to two bad addresses the night before because he thought that, if he showed the officers where Frog lived, Frog would kill him. The Defendant stated that he was shown a photographic lineup and had positively identified Frog.
Before an inculpatory statement, made during a custodial interrogation, may be introduced into evidence, the state must prove beyond a reasonable doubt that the defendant was first advised of his Miranda[2] rights and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement or promises. La. R.S. 15:451; State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16, 29, cert. denied, 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998); State v. Watts, 98-1073 (La.App. 5th Cir.5/19/99), 735 So.2d 866, 869.
A determination of voluntariness is made on a case-by-case basis, depending on the facts and circumstance of each situation. State v. Watts, 735 So.2d at 869. The admissibility of a confession or statement is a determination for the trial judge and his conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence. Id. Also, courts have held that the trial judge must consider the totality of the circumstances in deciding whether the confession is admissible. State v. Blank, 01-564 (La.App. 5th Cir.11/27/01), 804 So.2d 132, 136 (citations omitted).
Here, we find no error in the trial court ruling denying the Defendant's motion to suppress his statements. The evidence indicates that the Defendant was advised of his Miranda rights prior to the first of three statements he gave on December 2 and 3, 2001, that the Defendant was again advised of his Miranda rights on December 4, 2001 prior to giving a fourth statement, that the Defendant waived those rights, and that the statements were made freely and voluntarily and not under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises.
The Defendant argues that his second and third statements should have been suppressed, because he was not advised of his constitutional rights prior to each of them. We disagree. Although the Defendant did not formally waive his rights by signing a rights of arrestee form prior to giving the second statement, the record supports a finding that the Defendant still understood those rights because the second statement was given very close in time to the first statement. Further, it was acknowledged by the officer prior to the second statement that the Defendant was going to give the second statement of his own free will based on the first form that was used.
Sergeant Thornton testified that he did not formally advise the Defendant of his rights prior to taking the third statement, because there was no indication that the Defendant wanted to stop answering questions or that he did not understand his rights. He maintained that the third statement was the continuation of a lengthy interview, and that he was "comfortable" that the Defendant still understood his rights. Additionally, the jurisprudence does not require multiple Miranda warnings. State v. Bradley, *446 03-384 (La.App. 5th Cir.9/16/03), 858 So.2d 80, writs denied, 03-2745 (La.2/13/04), 867 So.2d 688.
The Defendant also argues that the second and third statements should have been suppressed because he underwent nine hours of interrogation without the benefit of sleep or a conversation with his relatives. The record reflects that the Defendant was allowed to use the restroom and to get something to eat and drink during the interview. However, there is no evidence to show that the Defendant wanted to stop the interview because he wanted to sleep, or that the State withheld sleep in order to obtain a confession. Additionally, there is no evidence to suggest that the Defendant would not have been provided sleep upon request. Further, there is no showing that family members tried to contact the Defendant and were unable to do so.
With respect to the length of the interview, the record indicates that the officers used the approximate six hour delay between the end of the second statement and the beginning of the third one in order to verify the Defendant's story, among other things. Thus, we find that the length of the interrogation was not attributable to coercion, but rather to the Defendant's discovered deception in his initial statement necessitating further questioning.
The Defendant in his pro se brief argues that the testimony of Sergeant Thornton and Detective Morales was inconsistent and did not satisfy the State's burden of proving that he knowingly and voluntarily waived his rights. As was stated previously, the record reflects that Sergeant Thornton testified that he did not formally advise the Defendant of his rights prior to taking the third statement, because there was no indication that the Defendant wanted to stop answering questions or that he did not understand his rights, and that he was "comfortable" that the Defendant still understood his rights. On the other hand, the record indicates that Detective Morales testified that Sergeant Thornton went over those rights again with the Defendant prior to the third statement. Although the Defendant is correct that this testimony was inconsistent, it is reasonable to find that either Sergeant Thornton or Detective Morales was mistaken in their recollection on this point. It does not, however, negate the trial court finding that the Defendant gave the statements knowingly and voluntarily.
The Defendant in his pro se brief also argues that State's Exhibits 4 and 7 (Defendant's third and fourth statements, respectively) were inadmissible, because his waiver of rights prior to those statements was not knowingly and intelligently made, because the State failed to prove that he waived his rights to be interrogated regarding aggravated burglary as well as murder.
The rights of arrestee form dated December 2, 2001, State's Exhibit 1, completed prior to the Defendant's first, second, and third statements, reflects that the Defendant was advised he was "UNDER INVESTIGATION RELATIVE TO: RS 14:30 RELATIVE TO Murder." The rights of arrestee forms dated December 3 and 4, 2001, State's Exhibits 5 and 6, respectively, completed prior to the Defendant's fourth statement, both indicate that the Defendant was "UNDER ARREST FOR AND WILL BE CHARGED WITH VIOLATION OF: R.S. 14:30 RELATIVE TO Murder."
La. R.S. 14:30 provides in pertinent part:
A. First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm *447 and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, aggravated rape, forcible rape, aggravated burglary, armed robbery, drive-by shooting, first degree robbery, simple robbery, or terrorism.
Here, the record shows that the Defendant knew he was going to be questioned during statements three and four relative to first degree murder, which lists aggravated burglary as one of the possible elements of that offense. The fact that White and "Frog" were engaged in the perpetration of an aggravated burglary at the time White was shot was part of the events surrounding White's death. Because White's death involved an aggravated burglary, we find that it was made clear to the Defendant that the questioning would pertain to both murder and burglary.
Considering the above, we find that the record supports the trial court finding that the Defendant knowingly and voluntarily waived his constitutional rights and gave all of the statements freely and not under the influence of fear, intimidation, menaces, threats, inducement or promises. These assignments of error lack merit.

PRO SE ASSIGNMENT OF ERROR NUMBER THREE
By this assignment of error the Defendant argues that the trial court erred in denying his motion to withdraw his guilty plea for failure to use an application for post-conviction relief, because the post-conviction relief provisions of La.C.Cr.P. art. 926(D) do not apply to motions to withdraw guilty pleas made under La.C.Cr.P. art. 559.
On July 14, 2004, the Defendant entered a guilty plea and was sentenced to imprisonment at hard labor for 15 years. On that same date, he filed a motion for appeal that was granted. On August 2, 2004, the Defendant filed a motion to withdraw his guilty plea which was denied. In its denial the trial court stated:
Defendant has filed a Motion to Withdraw his Guilty plea based on Constitutional violations. Defendant's claims are properly raised in an application for post-conviction relief. Pursuant to Louisiana Code of Criminal Procedure 926(D), a petitioner of Post Conviction Relief `shall use the uniform application for post conviction relief approved by the Supreme Court of Louisiana.' Furthermore, Subsection (E) of 926 provides, "Inexcusable failure of the petitioner to comply with the provisions of this Article may be a basis for dismissal of his application." Defendant has failed to use the proper application to file his Post Conviction Relief application. Defendant should re-file his application in compliance with Louisiana Code of Criminal Procedure Article 926(D).
On August 30, 2004, the Defendant filed a motion to reconsider his motion to withdraw guilty plea and it was denied.
La.C.Cr.P. art. 559, contrary to the defense argument, does not apply to attempts to withdraw a guilty plea after sentencing. Moreover, under La.C.Cr.P. art. 916,[3] the trial court was divested of *448 jurisdiction to act on the motion to withdraw the guilty plea since it was not filed until after sentencing. The Defendant has an avenue to assert his claim that his guilty plea is constitutionally infirm through post-conviction procedures. Thus, we find that the trial court was correct in its ruling that the Defendant must assert his arguments regarding the unconstitutionality of his guilty plea through post-conviction procedures. La.C.Cr.P. art. 924 et seq. This assignment of error lacks merit.

PRO SE ASSIGNMENT OF ERROR NUMBER FOUR
By this assignment of error the Defendant argues that the trial court erred in sustaining the State's objection to a question limiting cross-examination of a State's witness. The Defendant contends that his confrontation rights were violated because he was not allowed to fully cross-examine Sergeant Thornton as to what led him to feel "comfortable" that the Defendant still understood his rights before the third statement was given.
Sergeant Thornton testified at the suppression hearing on direct examination that he took a third statement from the Defendant. He explained that no force or coercion was applied in order to obtain the statement, that no promises were made, that the Defendant did not indicate at any time that he wanted to stop speaking to him or Detective Morales, and that at no time did the Defendant indicate he wished to have an attorney present.
During cross-examination, defense counsel asked Sergeant Thornton whether he re-advised the Defendant of his rights prior to the third statement. Sergeant Thornton testified that he did not verbally re-read the waiver of rights form, but that the Defendant agreed to give a third statement. Defense counsel asked Sergeant Thornton why he did not verbally re-read the form. He explained that there was no indication that the Defendant wanted to stop, and there was no indication that the Defendant did not understand his rights from the first time they were given. He further explained that the third statement was a continuation and final part of a lengthy interview.
Defense counsel then asked Sergeant Thornton what steps he took to assure that the Defendant still understood what his rights were, and that the Defendant had freely and voluntarily waived his rights. Sergeant Thornton responded that the "free and voluntary part" was in the beginning. He submitted that there was one interview with three statements, and that if there would have been any indication at all that the Defendant wanted to stop, he would have stopped. He testified that if there was any indication that the Defendant did not understand any aspects of his rights, he would have noted it and explained it to him. Sergeant Thornton stated that the Defendant agreed to continue with the statement.
Defense counsel noted that Sergeant Thornton said to the Defendant, "`[a]nd once again you've agreed to talk to us and help us in what information you have regarding *449 his death[.]'" Defense counsel then stated, "[b]ut you didn't take the further step to ask him whether he still understood his rights, did you?" Sergeant Thornton responded that he did not take the step because he was "comfortable" that the Defendant understood his rights. Sergeant Thornton admitted that he did not ask the Defendant whether he wanted an attorney at that point.
Defense counsel then asked Sergeant Thornton how he knew that the Defendant still understood his rights at the time of the third statement. The State objected, arguing that the question had been asked and answered. The trial court sustained the objection, and defense counsel noted his objection.
The Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution of 1974 guarantee an accused in a criminal prosecution the right to confront the witnesses against him. The primary purpose behind this right is to secure for the defendant the opportunity for cross-examination. Davis v. Alaska, 415 U.S. 308, 315-316, 94 S.Ct. 1105, 1109-1110, 39 L.Ed.2d 347 (1974); State v. Joseph, 01-360 (La.App. 5th Cir.10/17/01), 802 So.2d 735, 745, writ denied, XXXX-XXXX (La.12/13/02), 831 So.2d 979. Cross-examination is the primary means by which the believability of a witness and the truth of his testimony are tested. State v. Hotoph, 99-243 (La.App. 5th Cir.11/10/99), 750 So.2d 1036, 1046, writ denied, 99-3477 (La.6/30/00), 765 So.2d 1062 and writ denied, 00-0150 (La.6/30/00), 765 So.2d 1066.
Here, the record indicates that defense counsel was able to thoroughly cross-examine Sergeant Thornton regarding why he did not re-advise the Defendant of his rights prior to the third statement. Sergeant Thornton repeatedly explained that he advised the Defendant of his rights in the beginning and that there was no indication prior to the third statement that the Defendant wanted to stop the interview or that the Defendant did not understand his rights. The additional question was repetitive.
Based on our review of the questioning in its entirety, we find that the trial court did not err in sustaining the objection. The issue had been thoroughly explored. This assignment of error lacks merit.

ERROR PATENT DISCUSSION
The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5th Cir.1990). The review reveals one error in this case.
The trial court failed to properly inform the Defendant of the prescriptive period for filing post-conviction relief pursuant to La.C.Cr.P. art. 930.8. At sentencing, the trial court advised the Defendant that he had "two years from today's date to seek post-conviction relief." That information is incorrect. La.C.Cr.P. art. 930.8 provides that the prescriptive period begins to run "from the day the judgment of conviction and sentence become final." Therefore, we instruct the trial court, on remand, to send written notice to the Defendant within ten days of the rendition of this opinion of the correct statement of the law regarding the prescriptive period for post conviction relief and to file written proof in the record that the Defendant received the notice. State v. George, 99-887 (La.App. 5th Cir.1/4/00), 751 So.2d 973, 975.
Accordingly, for the reasons set out above, the Defendant's guilty plea conviction for manslaughter and his sentence to 15 years imprisonment at hard labor are affirmed. The case is remanded to the *450 district court to provide proof in the record of the Defendant's receipt of appropriate notice, under La.C.Cr.P. art. 930.8, of the prescriptive period for post conviction relief.
CONVICTION AND SENTENCE AFFIRMED; CASE REMANDED.
NOTES
[1] State v. Crosby, 338 So.2d 584 (La.1976).
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] The jurisdiction of the trial court is divested and that of the appellate court attaches upon the entering of the order of appeal. Thereafter, the trial court has no jurisdiction to take any action except as otherwise provided by law and to:

(1) Extend the return day of the appeal, the time for filing assignments of error, or the time for filing per curiam comments in accordance with Articles 844 and 919.
(2) Correct an error or deficiency in the record.
(3) Correct an illegal sentence or take other appropriate action pursuant to a properly made or filed motion to reconsider sentence.
(4) Take all action concerning bail permitted by Title VIII.
(5) Furnish per curiam comments.
(6) Render an interlocutory order or a definitive judgment concerning a ministerial matter not in controversy on appeal.
(7) Impose the penalty provided by Article 844.
(8) Sentence the defendant pursuant to a conviction under the Habitual Offender Law as set forth in R.S. 15:529.1.