737 So.2d 660 (1998)
STATE of Louisiana
v.
Kevan BRUMFIELD.
No. 96-KA-2667.
Supreme Court of Louisiana.
October 20, 1998.
*662 G. Paul Marx, Lafayette, Counsel for Applicant.
Richard P. Ieyoub, Atty. Gen., Douglas P. Moreau, Dist. Atty., Premila Burns, Monica L. Thompson, Counsel for Respondent.
LEMMON, Justice.[*]
This is a direct appeal to this court from a conviction of first degree murder and a sentence of death. La. Const. art. V, § 5(D). The principal issues involve (1) the admission in the penalty phase of evidence of unrelated criminal conduct; (2) the prosecutor's reference to defendant's future dangerousness; (3) the prosecutor's reference in closing argument in the penalty phase to defendant's claim of a coerced confession in another case; (4) the court's discovery order requiring the defense to produce the report of a non-testifying expert; (5) the admission of the surviving victim's hypnosis-refreshed testimony; (6) the curtailment of defendant's attempts to impeach the surviving victim; (7) various claims concerning ineffective assistance of counsel; and (8) the alleged failure of the court to properly preserve the record.[1]

Facts
On January 5, 1993, defendant, accompanied by Henri Broadway, went to a self-described psychic counselor to obtain a reading. Defendant, who was carrying a gun, told the psychic he planned to commit a robbery and wanted to know the best day to do so.
Two days later, a pair of armed robbers ambushed a grocery store manager who was being escorted to the bank by an off-duty police officer working a security detail. In the fusillade of bullets fired into the police unit, the officer was killed by five shots, but the store manager, although, suffering eleven bullet wounds, survived the attack.
*663 The morning after the murder, defendant nervously told Eddie Paul that he had just "killed a son of a bitch." Paul also overheard defendant tell Broadway that it had been a waste of time because they did not obtain anything during the attempted robbery. Remembering a conversation a week or two earlier in which defendant, Broadway, and his cousin, West Paul, planned the robbery of a bank, Eddie Paul informed the police on January 10 that defendant had committed the murder.
The police apprehended defendant the next day. Upon interrogation, defendant originally denied any connection with the shooting, claiming he was with his brother when the crime occurred. However, when later informed that his brother had not corroborated his alibi, defendant gave a videotaped statement in which he admitted involvement in the crime, but claimed he acted as the getaway driver while West Paul and Broadway committed the robbery.
Based on that information, the police arrested West Paul and Broadway, who both gave statements about the crime inconsistent with defendant's claim that he acted only as the getaway driver. Confronted with that information, defendant gave a second videotaped interview in which he admitted shooting the victims. Several hours later, defendant also confessed to an armed robbery in Clinton, Louisiana.
The jury found defendant guilty as charged. After the penalty phase of the trial, the jury unanimously recommended a sentence of death, finding as aggravating circumstances that defendant was engaged in the perpetration of an attempted armed robbery, that the victim was a peace officer engaged in her lawful duties, and that defendant knowingly created a risk of death or great bodily harm to more than one person. Defendant has appealed his conviction and sentence.

Other Crimes Evidence
Defendant raises several issues relating to evidence of unrelated criminal conduct. Defendant first argues that the prosecutor improperly introduced evidence during the penalty phase that defendant committed an unadjudicated attempted murder during the armed robbery in Clinton, Louisiana.
Prior to the trial of the present crime, defendant was charged with the Clinton crime and was convicted of armed robbery. In the penalty phase of the present trial, the prosecutor introduced a certified copy of the bill of information charging defendant with armed robbery, as well as the minutes of his conviction for the crime. The prosecutor also called the victim of the Clinton robbery, who testified that defendant, accompanied by defendant's brother and West Paul, robbed him at gunpoint in 1992, left him on the side of the road, put a gun to his head, "and the gun clicked."
La.Code Crim. Proc. art. 905.2 provides that "[t]he sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the impact that the death of the victim has had on the family members." Evidence of a prior conviction is admissible in the penalty phase of a capital case, whether or not the defendant puts his character at issue, because the capital sentencing statute puts his character at issue. State v. Sawyer, 422 So.2d 95 (La. 1982), Accordingly, the evidence of the armed robbery conviction in this case clearly was admissible.
Defendant's complaint focuses on the admission of evidence of the conduct that arguably constituted attempted murder, as well as on the prosecutor's reference in closing argument to that unadjudicated conduct.
Rules governing the admission of evidence of unrelated and unadjudicated criminal conduct in penalty phase hearings to prove the defendant's character and propensities have evolved jurisprudentially. *664 In State v. Brooks, 541 So.2d 801 (La.1989), this court approved the prosecutor's introduction in the case-in-chief in the penalty phase of two unrelated and unadjudicated murders when the trial judge had determined in a separate hearing that (1) the evidence of the defendant's commission of the unrelated criminal conduct was clear and convincing; (2) the proferred evidence was otherwise competent and reliable; and (3) the unrelated conduct had relevance and substantial probative value as to the defendant's character and propensities.
In State v. Jackson, 608 So.2d 949 (La. 1992), this court established limitations on the types of evidence of unrelated and unadjudicated criminal conduct that may be introduced by the prosecutor in the case-in-chief in the penalty phase of a capital sentencing hearing. To be admissible, the evidence of unadjudicated criminal conduct must involve violence against the person of the victim, and the period of limitation for instituting prosecution must not have run at the time of the indictment of the accused for capital murder. Id. at 955.
In State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16, 22, this court declined to place significant restrictions on the amount of this type of evidence, as long as the evidence is highly relevant to the defendant's character and propensities. Nevertheless, this court warned that:
[T]he judge, having already ruled at the pretrial hearing on the admissibility of evidence of the unadjudicated conduct, should cautiously consider the quantum of evidence necessary to convey the message to the jury that the defendant has engaged in other serious criminal conduct that the jury should consider in its determination of sentence, without shifting the jury's focus from its function of determining the appropriate sentence in the capital case to a focus on the defendant's involvement in other unrelated criminal conduct.
Id. at 23.
In the present case, the prosecutor gave defense counsel the required notice of intent to use other crimes evidence and presented evidence at the pretrial hearing that easily met the required clear and convincing standard. Moreover, the conduct involved violence against the person, and the statute of limitations had not run at the time defendant was indicted on the instant charge. Finally, the brief testimony of the victim of the Clinton robbery provided substantial probative value as to defendant's character and propensities. Accordingly, the court did not err in admitting the evidence of the unadjudicated criminal conduct that arguably constituted attempted murder.
Defendant contends, however, that the evidence of an attempted murder was improperly admitted because he was only charged with and convicted of armed robbery.
The Jackson decision prohibited introduction of evidence of the original charge when the defendant was convicted of a lesser crime. Id. at 954. Here, however, defendant was indicted for (and convicted of) armed robbery, and no evidence or prosecutor's comment suggested that defendant was ever charged with attempted murder. Moreover, as noted above, the testimony of the victim of the Clinton robbery did not violate the Jackson standards and was properly admitted into evidence. Finally, the prosecutor's comments in closing argument that defendant "put that gun to [the victim's] head and pull[ed] the trigger" during the Clinton robbery and that defendant would have killed the robbery victim "but for a gun misfiring" was proper argument based on the record and on fair inferences drawn from the record.
Defendant also complains about the admission of evidence of a previous murder attributed to defendant in a report by a sociologist consulted by the defense.
*665 Defendant's mitigation expert, Dr. Cecile Guin, testified on her direct examination that during her investigation of defendant's social history she used a report prepared by Dr. Bryan Jordan, an expert who was consulted by the defense but did not testify. On cross-examination, Dr. Guin conceded that in her report she characterized defendant's criminal history as not "very lengthy or complicated." The prosecutor then directed Dr. Guin to a portion of her report stating defendant declared he had witnessed a drug deal and murder in 1989 and had "turned state's evidence" against the perpetrator, and questioned Dr. Guin on defendant's participation in the 1989 event.[2] Referring to Dr. Jordan's report, the prosecutor pointed out the statement that defendant admitted that "he in fact ... did shoot at a drug user who had refused to pay and drove away in his car." Dr. Guin responded, "That is one of the conflicting reports that I read."
In her closing penalty phase argument, the prosecutor referred to the "1989 incident involving the killing of the drug dealer" and "the conflicting versions that [defendant] apparently gave Dr. Guin, and the other version in which he admitted his involvement in this case to Bryan Jordan, the person whose report was repeatedly referred to during the course of this case."
Because the defense admitted use of the Jordan report on direct, the prosecutor on cross-examination was entitled to inquire into defendant's role in the drug-related homicide referred to in the report. The Jackson limitations on admissibility of unrelated criminal conduct in the penalty phase apply only to the state's case-in-chief, not to relevant rebuttal evidence. State v. Sepulvado, 93-2692 (La.4/8/96), 672 So.2d 158, 165, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996). Moreover, the prosecutor properly used the report to challenge Dr. Guin's conclusion that defendant's criminal history was not very lengthy. Under these circumstances, the prosecutor's questions about the Jordan report constituted proper cross-examination to impeach Dr. Guin's evaluation of defendant's prior criminal behavior.

Reference to Future Dangerousness
Defendant complains about a portion of the prosecutor's closing argument in the penalty phase referring to defendant's future dangerousness. In the complained-of portion of the argument, the prosecutor stated:
As long as [defendant] lives, others are in jeopardy and in danger and you saw the records.... [T]his man, as long as he lives and breathes, is a danger at the very least to other inmates and whatever jail he's housed in, he's a danger to whatever people in law enforcement he will be connected with. He has already shown this as he waits for a trial on this charge, that he has not regard for anyone else, he has no regard for authority, he has no problem with brutalizing and killing police officers or battering them.
This court has stated that the "prosecutor's remarks about the societal costs of a life sentence, misspent tax dollars, future escapes, more killings by defendant, were improper." State v. Busby, 464 So.2d 262, 267, (La.1985), sentence vacated on other grounds, 538 So.2d 164 (La.1988). Without deciding whether a single statement in closing argument that the defendant, if released, may kill again would require reversal of the sentence in other cases, we note in this case that defendant's mitigation expert admitted a number of incidents in which disciplinary action against defendant had been taken since his incarceration. Therefore, the prosecutor had a factual basis for the remarks in this case, and this portion of the closing argument did not inject an arbitrary factor into the proceedings.

*666 Reference to Defendant's Claim of Coerced Confession in Unrelated Case.

Defendant argues that the prosecutor's comments in closing argument about defendant's attempts to suppress a confession in an unrelated case warrants a reversal of the penalty in this case.
In the closing argument in the penalty phase, the prosecutor emphasized that this murder involved the highest degree of aggravation, since it was premeditated as opposed to a spontaneous killing in the course of a robbery. The prosecutor noted that the planning of the crime was revealed in defendant's confession. While conceding that defendant asserted the confession was coerced, the prosecutor made the following argument against the claim of coercion:
[T]he taped statements that you heard by the defendant which, ... he alleged to have been coerced, just as [the arresting officer in the Clinton robbery] told you that when he gave a taped statement concerning his crime against [the victim of the Clinton robbery] that he readily confessed to the same day, later on, again you hear the allegations. It's his M.O. He's street smart, he's savvy, and after he's confessed, what is he going to do but go back and attack the officers who've gone about doing their job, giving him his rights and taking a proper statement?[3]
Later, the prosecutor referred to counsel's cross-examination of the state witnesses, stating, "during the course of this trial those very police officers who go about and try to protect us every day have been assailed, have been defamed through the allegations of this defendant when he is the person who is on trial."
Closing arguments in criminal cases should be restricted to the evidence admitted, to the lack of evidence, to conclusions of fact that may be drawn therefrom, and to the law applicable to the case. La.Code Crim. Proc. art. 774. While the trial judge has broad discretion in controlling the scope of closing arguments, Louisiana jurisprudence on prosecutorial misconduct has allowed prosecutors wide latitude in choosing closing argument tactics. See State v. Prestridge, 399 So.2d 564, 580 (La.1981). Nonetheless, the prosecutor should refrain from making personal attacks on defense strategy and counsel. See State v. Duplessis, 457 So.2d 604, 609 (La. 1984).
In the present case, the prosecutor did not suggest that defendant or his attorney did anything improper in attempting to suppress the confession in the earlier case. Rather, the prosecutor pointed to record evidence that this case was not the first one in which defendant had unsuccessfully claimed a confession was coerced. Because the jury had already rejected defendant's claim of a coerced confession in the guilt phase of this case, we conclude that the comments about defendant's claim of a coerced confession in a different case did not inject an arbitrary factor into the jury's deliberations during the penalty phase. Furthermore, the prosecutor's statement about defense counsel's cross-examination of police officers was a fair comment pointing out the frequently used strategy of attempting to shift the focus from the accused to the accuser.

Production of Report of Non-Testifying Expert
Defendant contends that the court erred when it granted a discovery motion and ordered his counsel to provide the prosecutor with the report prepared by Dr. Bryan Jordan whom defense counsel did not intend to, and in fact did not, call to testify at trial.
This court summarized an accused's discovery obligations regarding such reports *667 in State v. Touchet, 642 So.2d 1213, 1218-19 (La.1994), stating:
In Louisiana, the Code of Criminal Procedure recognizes that the onus of any criminal prosecution is upon the state, and that the state is not to receive any unfair advantages in the pretrial discovery process. La.C.Cr.P. arts. 724 and 725 provide for state discovery only of defense scientific or medical reports, and only after the defense has "opened the door" by its request for similar information in the possession of the state. La.C.Cr.P. art. 728 specifically forbids discovery of elements of anything but scientific and medical reports that were, in turn, first requested by the defense, and protects "statements made by ... witnesses or prospective witnesses [and] the names of defense witnesses or prospective defense witnesses" from discovery by the state. These provisions of the Code reflect a legislative recognition that the state should "shoulder the entire load" in a criminal prosecution and should not be allowed to circumvent the "burdens of independent investigation by compelling self-incriminating disclosures." Murphy v. Waterfront Commission of New York, 378 U.S. 52, 55, 84 S.Ct. 1594, 1597, 12 L.Ed.2d 678 (1964).
Because defense counsel did not seek medical or scientific reports from the prosecutor, the trial court arguably erred when it ordered the defense to provide Dr. Jordan's report. The prosecutor's right to discovery is very limited. Under La.Code Crim. Proc. art. 725, "[t]he state is not entitled to discover the defendant's reports of physical and mental examinations unless the defendant has first been granted relief under Article 719," and then may discover only reports "of a similar nature" to those previously requested by the defense from the prosecutor. State v. Rachal, 362 So.2d 737, 739 n. 5 (La.1978).
However, when Dr. Cecile Guin, the social worker-mitigation expert, testified in the penalty phase that she relied on, among other things, Dr. Jordan's report when she made her psychological evaluation of defendant, the prosecutor then became entitled to examine the report for possible impeachment material. See State v. Williams, 445 So.2d 1171, 1181 (La.1984). Because the prosecutor eventually would have obtained possession of the report, the defense fails to show any prejudice resulting from the court's order to produce Dr. Jordan's report. Cf. State v. Bourque, 92-0968 (La.7/1/93), 622 So.2d 198, 239 (holding that the defendant, before being entitled to relief, must show prejudice resulting from the state's failure to comply with discovery procedure).

Hypnosis-Refreshed Testimony of the Surviving Victim
Defendant first contends that the court should not have admitted the testimony of the store manager who survived the shooting, because her recollection of the crime and her identification of Henri Broadway as one of the assailants occurred only after she had been hypnotized by the police.
Immediately after the assailants fired the barrage of shots into the police car, Broadway reached into the car to get the bag of money and was face-to-face with the store manager. Although she had received eleven bullet wounds, the manager drove off. When the manager immediately reported the crime to the 911 operator, she could not describe either of the assailants. Later, she gave a detailed description of the assailant who reached into the car, and at trial she gave the jury a detailed description of one of the perpetrators. There was no objection to the testimony or the identification.[4] Consequently, defendant waived any claim based on the erroneous admission of this guilt phase *668 evidence. La.Code Crim. Proc. art. 841; State v. Taylor, 93-2201, p. 7, (La. 2/28/96), 669 So.2d 364, 369, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996).

The Curtailment of Defendant's Attempt to Impeach the Surviving Witness
Defendant also contends that the court erred by limiting impeachment of the store manager as to anti-psychotic medication she allegedly was taking.
Defense counsel questioned the manager in detail about medications prescribed for her after the incident. The manager listed "antianxiety" medication, "sleeping pills," and antidepressant medication taken for about a year after the murder. She stopped using the sleeping medication, but she began taking Prozac for depression about six months prior to trial. When defense counsel asked if she took some medications in doses larger than prescribed, the prosecutor objected. The court held a bench conference during which the prosecutor asserted that this line of questioning was irrelevant. Defense counsel responded that the witness first gave a description that did not describe Broadway and one year later identified Broadway as one of the robbers.
The court ultimately sustained the objection, explaining:
The jury has had the benefit of her description prior to her treatment. They've also had the benefit of her description subsequent to that treatment. They've had the benefit of the testimony regarding the medication that she's taking, and that's enough for the jury to make whatever decisions they're going to make about it. And again, that's all viewed against the backdrop that the description that you're talking about doesn't apply to your client.
As a general rule, a party may attack the credibility of a witness by examining him or her concerning any matter having a reasonable tendency to disprove the truthfulness of his or her testimony. La. Code Evid. art. 607 C. The subject matter of the attack, however, is limited by the relevancy standard of La.Code Evid. art. 403. Moreover, while La. Code Evid. art. 607 D provides that "extrinsic evidence to show a witness' bias, interests, corruption, or defect of capacity is admissible to attack the credibility of the witness," a witness cannot be cross-examined as to a fact which is collateral or irrelevant to the issue at hand merely for the purpose of contradiction or impeachment. State v. Vessell, 450 So.2d 938 (La.1984) (decided under former La.Rev.Stat. 15:494).[5] Finally, a trial court's ruling on the scope and extent of cross-examination should not be disturbed absent an abuse of discretion. State v. Coleman, 406 So.2d 563 (La.1981).
In the instant case, defense counsel cross-examined the store manager extensively about the medications prescribed for her after the murder. The judge's ruling also correctly noted the manager identification did not directly implicate defendant in the crime, and defense counsel did not object to the identification at trial. Under these circumstances, defendant fails to show any prejudice resulting from the court's ruling which prevented him from questioning the manager further regarding the prescribed medications.

Ineffective Assistance of Counsel
Defendant contends that his trial attorneys rendered constitutionally deficient assistance in a number of areas.
A claim of ineffective assistance of counsel generally is more properly raised in an application for post-conviction relief than on appeal. State v. Hamilton, 92-2639 (La.7/1/97), 699 So.2d 29, cert. denied, ___ U.S. ___, 118 S.Ct. 1070 (1998). In post-conviction proceedings, the district judge can conduct a full evidentiary hearing on the matter. However, when the record contains evidence sufficient to decide *669 the issue, the appellate court may consider the issue in the interests of judicial economy. See, e.g., State v. Ratcliff, 416 So.2d 528 (La.1982). Moreover, this court on several occasions in death penalty cases, when the issue is sufficiently troubling, has not deferred the issue to post-conviction proceedings, but has conditionally affirmed the conviction and sentence, and remanded the case to the district court for a hearing on the issue of ineffective assistance. See, e.g.. State v. Wille, 559 So.2d 1321 (La.1990).
In the present case, this court, after considering each of defendant's contentions regarding ineffective assistance of trial counsel, concludes that defendant failed to establish a sufficient basis to deviate from the normal practice of relegating such issues to post-conviction proceedings.

Incomplete Record
Defendant contends that the trial court's failure to have each bench conference and ruling properly transcribed denied him the right to full appellate review of his conviction and sentence.
Defendant complains primarily about bench conferences which took place during the cross-examination of Eddie Paul, the cousin of co-perpetrator West Paul, who alerted the authorities about defendant's involvement in the murder. The first omission occurred when defense counsel suggested that the witness may have been previously incarcerated on charges other than those dealing with his failure to pay child support. After the untranscribed bench conference, defense counsel abandoned the issue.
The second untranscribed bench conference during Paul's testimony occurred when the prosecutor objected to defense counsel's reading into the record a statement that Paul had given to the police. The prosecutor requested that she be allowed to review, before the statement was read to the jury, any allegedly prior inconsistent statement that was to be used to impeach the witness. The court then held an off-the-record discussion with the attorneys and ordered a recess.
The third unrecorded bench conference took place during cross-examination of Paul after defense counsel asked him if he remembered telling the police that nobody planned the crime at his residence. Paul responded, "I couldn't have told him that," and defense counsel began to read from his recorded statement. The prosecutor objected, claiming the portion of the transcript which defense counsel was reading was not responsive and thus did not impeach Paul's testimony. After the conference, defense counsel did not pursue the alleged discrepancy between Paul's statement to the police about the planning of the robbery and his trial testimony.
The fourth unrecorded conference took place after defense counsel asked Paul if the police threatened to whip him when they arrested him in connection with the offense. Again the prosecutor requested a bench conference, and defense counsel did not pursue the issue after the sidebar.
The final two unrecorded bench conferences during Paul's testimony occurred when the prosecutor objected to defense counsel's questions about events following Paul's arrest, claiming they were irrelevant and lacked impeachment value.
This court has ordered a new trial when material portions of the trial record were unavailable or incomplete; however, a "slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal" does not require reversal of a conviction. State v. Parker, 361 So.2d 226 (La.1978); State v. Ford, 338 So.2d 107, 110 (La.1976).
In this case, the bench conferences primarily concerned the relevancy of defense counsel's questions which did little to impeach Paul's testimony. Because defendant failed to show that he was prevented from presenting any relevant evidence, he has not established that prejudice resulted *670 from the absence in the record of the substance of the conferences.
Defendant also complains about an unrecorded bench conference which took place during his examination of an employee of the Louisiana State Police Crime Lab.
The sidebar conference occurred after defense counsel asked the witness if he had an opinion about whether any .25-caliber bullets struck either of the victims. The prosecutor objected, arguing that the expert was not qualified to respond to the question, and the court sustained the objection after an unrecorded bench conference. Later, after defense counsel rephrased the question, the expert responded.
Finally, defendant complains about an unrecorded bench conference which took place after the prosecutor objected to the witness' reading from a list of exhibits in order to testify which pieces he had examined. After the sidebar conference, the witness stated that several items seized by the police had turned out to be irrelevant to the investigation.
In both instances, the witness ultimately answered defense counsel's questions. Consequently, defendant has failed to demonstrate that any prejudice resulted.

Capital Sentence Review
Under La.Code Crim. Proc. art. 905.9 and La.S.Ct.R. 28, this court reviews every sentence of death to determine if it is constitutionally excessive. In making this determination, the court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
Defendant was twenty years old on the date of the crime, and his IQ was seventy-five. He had a lengthy criminal record, including an arrest as a juvenile for first degree murder and distribution of cocaine in 1989. The police report of that incident indicated that defendant and a friend, under instructions by a drug dealer whose customer could not pay, shot at a car being driven by the customer, who later died from the gunshot wounds. Charges against defendant and his accomplice, also a juvenile, were dropped in exchange for their testimony against the seller of the narcotics.
As an adult, defendant was convicted of the armed robbery in Clinton, discussed above. Defendant also had adult convictions for felony theft, attempted possession of cocaine, and simple battery of a police officer.

1. Passion, Prejudice, or Other Arbitrary Factors

Defendant, the victim and the jury foreman were all African-Americans. Nothing in the record suggests race was an issue in the trial.
Defendant's case received extensive news media coverage. However, as discussed in the appendix about defendant's change of venue argument, more than one hundred prospective jurors were questioned during fourteen days of voir dire, and the court excused less than twenty because of their inability to render a verdict based on the evidence presented at trial. Moreover, defendant's trial took place two and one-half years after the offense occurred.

2. Aggravating Circumstances

The prosecutor presented more than sufficient evidence to demonstrate the aggravating circumstances that defendant was engaged in the perpetration of an attempted armed robbery and that defendant knowingly created a risk of death or great bodily harm to more than one person. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Even if there was merit in defendant's contention *671 that the jury erred when it found sufficient evidence that defendant intended to kill a peace officer engaged in her lawful duties,[6] the jury's sentencing determination would not be vacated because there was sufficient evidence to support at least one other aggravating circumstance and the evidence relating to the arguably unsupported aggravating circumstance did not interject an arbitrary factor into the proceedings. State v. Sawyer, 422 So.2d 95 (La.1982); Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

3. Proportionality

The federal Constitution does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). However, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Thompson, 516 So.2d 349 (La.1987). Nevertheless, this court has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, concluding that there was a sufficiently "large number of persuasive mitigating factors." State v. Sonnier, 380 So.2d 1, 9 (La.1979).
Jurors in the 19th Judicial District Court have recommended imposition of the death penalty in approximately thirteen cases. In the case of Henri Broadway, the other shooter involved in the crime, the jury also returned a death verdict.
Several other cases in which the death penalty was imposed involved facts similar to this case. See State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703 (an eighteen-year-old defendant murdered the victim while attempting to rob him in his truck; earlier that day, the defendant had shot and wounded another victim during the attempted perpetration of an armed robbery); State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865, cert. denied, ___ U.S. ___, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997) (the seventeen-year-old defendant kidnaped the victim while stealing his truck, drove him to a secluded area, and shot him three times in the head); State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326, cert. denied, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996) (the nineteen-year-old defendant, while engaged in the armed robbery of a fast-food restaurant, shot and killed one of the employees); State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996) (during the armed robbery of a fast-food restaurant where defendant had previously been a employee, he shot and killed one employee, and shot and permanently paralyzed another); State v. Williams, 383 So.2d 369 (La.1980) (defendant shot and killed the victim during an armed robbery of a grocery store).

Decree
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution, as provided by La.Rev.Stat. 15:567, until either (a) defendant fails to petition the United States Supreme Court timely for certiorari; or (b) that Court denies his petition for certiorari and either (i) defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari, or (ii) that Court denies his petition for rehearing.

APPENDIX

PRE-TRIAL AND VOIR DIRE ISSUES

Challenges for Cause
Defendant claims that the trial court erred when it denied his cause challenges to jurors Wayne Bahr, Dayle Smith and Monica Salvaggio, Bahr and Smith because *672 of their predisposition to vote in favor of the death penalty and Salvaggio because of her belief in defendant's guilt. The prosecutor notes, and a review of the record confirms, that Salvaggio was struck for cause. Accordingly, we need not consider any argument concerning her.
When questioned on direct, Bahr indicated that he could return either a death sentence or one of life imprisonment, depending on the particular facts of the case and the aggravating and mitigating evidence. When asked by defense counsel whether he could consider youth as a mitigating factor, Bahr said that if defendant was "real young, you know, that might come into play. But I don't know how much it would come into play. Right now I am saying I don't know if it would [come into play] a whole lot just because he was younger when he did it."
Defense counsel then asked if Bahr would "automatically" vote to impose the death penalty absent mitigating circumstances. The prosecutor objected on grounds that the question presupposed a set of facts, and the court sustained the objection. After the court sustained three more prosecution objections to essentially the same question, defense counsel asked, "Given a first degree murder, do you feel that the only appropriate sentence is death?" Bahr explained, "If [defendant] is convicted of first degree murder and the aggravated situations are proven and one of the mitigations [sic] is not proven to me then, yes, I would believe in death because that is per law."
The defense challenged Bahr for cause, claiming his responses indicated a predisposition to impose the death. The prosecutor responded:
Your honor, when I questioned this man, and I was the first one to do it concerning his attitude on the death penalty, he came into this courtroom and said that he did a lot of thinking about it. Particularly in view of the fact that he was being called into this scenario. I think very candidly said that it would require a lot of soul searching before he could even return the death penalty in this case. As to each of the questions they were trying to get the man into the trick bag. I objected. The court sustained that objection three times. He stated that he would not do it automatically. He would have to listen to the aggravating and mitigating evidence at trial. That is what I got from him very clearly.
Defense counsel acknowledged that this statement correctly characterized Bahr's testimony, but nonetheless maintained that his statement that he would return a death verdict if defendant did not present mitigating evidence revealed a predisposition toward a death verdict. The court disagreed, stating it did not indicate a predisposition, and denied the challenge for cause.
Juror Dayle Smith indicated in his pretrial questionnaire that he found attorneys to be basically dishonest. He also indicated he had "problems" with the judicial system because of "cases where ... the lawyer knows their client is guilty and ... say that in court, that lawyer gets disbarred." Despite these views on the adversarial system, Smith responded, when asked if he could act as a fair juror to defendant, that he did not believe his views "would affect anything." However, the defense questioned Smith further on the topic, asking him, "can you assure us you would be a fair and impartial juror and what you know and your feelings would not affect your deliberations in this case?" Smith responded, "No, not 100 per cent [sic]." The prosecutor objected, arguing that the juror's opinion was one of the judicial system and not of the facts of the case. The court sustained the objection, and Smith then maintained that he could be a fair and impartial juror.
When questioned on direct about his views of capital punishment, Smith stated:

*673 My view is that it has its purpose. I feel sometimes it's not applied correctly. For instance, someone will kill one person and get it and another person kills five and might get paroled in seven years. I think it's applied a little unevenly, but that's the only thing I have against it.
Smith also maintained that he thought death the appropriate penalty in certain cases. When informed by the defense that the case involved the killing of a police officer, Smith responded that because of that aggravating factor, "I would probably lean toward the death penalty, but if enough mitigating evidence was presented, I would consider [life imprisonment]." He also stated that defendant's youth at the time of the crime "by itself" would not cause him to change his verdict. Defense counsel pursued the issue, asking Smith, "If the court instructs you to consider it inby itself as a mitigating circumstance in deciding to impose the death penalty or life imprisonment, you really couldn't do that, could you?" Smith responded, "I would consider it, but I would tell you right now personally that by itself, it would not be enough unless there is something else presented." Defense counsel then asked Smith, "what ... if I gave you information about ... the capacity of the offender to appreciate the criminality of his conduct or to conform that conduct to a requirement of law was impaired as a result of intoxication ... Could you consider that?" Smith said, "No". When pressed, Smith stated, "That's ... one of my beliefs. I am like a lot of other college or post-college students. I go out and drink heavily sometimes, but one of my beliefs is no matter how much you drink, you're still responsible for your actions." Smith later clarified, "It would depend on whether that mental disease or defect impaired his ability to know right from wrong. You can have mental disease and still know right from wrong."
The defense challenged Smith for cause, claiming he indicated he would not consider either intoxication or youth as mitigating factors. The prosecutor requested that Smith be given the definition of intoxication in La.Code Crim.Proc. art. 905.5. When the defense interjected that Smith also stated he would not consider defendant's youth, the court corrected him, stating, "He said he could consider youth but it wouldn't mean that much by itself. Those are the words out of his mouth." The court then read Smith the definition of intoxication in the statute and asked him if he consider that as a mitigating circumstance, and he responded affirmatively. The court then denied defendant's challenge for cause.
A trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Cross, 93-1189, pp. 6-7 (La.6/30/95); 658 So.2d 683, 686-687; State v. Robertson, 92-2660 (La.1/24/94); 630 So.2d 1278, 1281. When a prospective juror has voiced an opinion seemingly prejudicial to the defense, a trial judge's refusal to excuse the juror is not an abuse of discretion if, on further inquiry or instruction, the juror has demonstrated a willingness and ability to decide the case impartially according to the law and evidence. Robertson, 630 So.2d at 1281.
The proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); La.Code Crim.Proc. art. 798(2)(a)(b). The "substantial impairment" standard also applies to the reverse-Witherspoon challenges. Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). If a prospective juror's inclination toward the *674 death penalty would substantially impair the performance of the juror's duties, a challenge for cause is warranted. State v. Ross, 623 So.2d 643, 644 (La.1993).
A juror who professed that she could "consider" a death sentence, but would begin from the premise that life is the appropriate sentence based on particular mitigating circumstances applicable to the case (e.g. the youth of defendant), has been properly excluded from the sentencing phase. State v. Williams, 96-1023, pp. 9-10 (La.1/21/98); 708 So.2d 703, 713. A juror who states that he will return a death sentence solely on the basis of the verdict rendered at the guilt stage, unless the defendant produces clear and convincing mitigating evidence that he should not die, is properly excluded because Louisiana, by deliberate choice, does not provide any fixed standard for considering and giving effect to mitigating evidence. State v. Strickland, 94-0025, pp. 48-49 (La.11/1/96); 683 So.2d 218, 238 ("[T]his Court has determined that the lack of a standard actually gives defendants an advantage by allowing jurors to consider any amount of mitigating evidence in their determination.").
In the instant case, the court did not abuse its discretion when it denied the challenges for cause. Bahr's responses did not indicate that he would refuse to consider the defendant's youth as a mitigating circumstance, but indicated only, and appropriately, he could not say how much weight he would attach to that single circumstance before hearing all of the evidence in the case. His responses reflected his disposition toward imposing the death penalty in cases in which the prosecutor proves the existence of aggravating circumstances and the defense fails to offer evidence in mitigation. Although jurors are not required to return a death penalty under any combination of circumstances, including an overwhelming imbalance of aggravating and mitigating factors, Bahr was responding to a hypothetical question which did not fit this case. How Bahr would respond in a hypothetical situation in which the defense presented no mitigating evidence did not disqualify him as a juror in a case in which the defense presented.several mitigating factors.
Similarly, although Smith indicated that defendant's youth alone would not cause him to vote for life imprisonment, he did state that he could consider youth when deciding what verdict to return.
A review of the voir dire record as a whole reveals that the trial court did not abuse its discretion when it denied the cause challenges.

Use of Peremptory Challenges Before a Full Panel of Jurors Was Impaneled
Defendant claims that the trial court erred in requiring the defense to simultaneously exercise its last three peremptory challenges after both sides provisionally accepted individual jurors under La.Code Crim.Proc. art. 788, but before the court swore the jury panel as a whole under La.Code Crim.Proc. art. 790. See La.Code Crim.Proc. art. 795B(1).
Defense counsel had exercised nine of his twelve peremptory challenges before the court provisionally seated the twelfth juror. Defense counsel then sought to exercise his remaining peremptory challenges on jurors who had been previously sequestered. The prosecutor did not object to this request to exercise back strikes. However, the prosecutor argued that defendant should be required to use all of his remaining peremptory challenges in one stroke, rather than exercising one and then assessing the next voir dire panel before exercising each subsequent challenge. After a recess, the court allowed defendant to exercise his remaining peremptory challenges simultaneously.
Both prosecutor and defendant may exercise remaining peremptory challenges against individually sworn jurors before the swearing of the full jury panel under La.Code Crim.Proc. arts. 790, 795. State v. Watts, 579 So.2d 931 (La.1991).
*675 In the instant case, defendant was not denied his remaining peremptory challenges, and we cannot say that the trial judge abused his discretion in conducting the voir dire as he did. In any event, this matter is subject to harmless error analysis. State v. Taylor, 93-3301, p. 24 (La.2/28/96); 669 So.2d 364, 377, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996). In Taylor, the trial court denied the defendant's request to exercise his remaining four peremptory challenges at the conclusion of jury selection. Id. Despite the violation of the Watts rule, no reversible error occurred because the voir dire did not violate the constitutional "right to full voir dire examination of prospective jurors...." La. Const. art. I § 17; Taylor, 669 So.2d at 378.
In the instant case, jury selection had begun twelve days earlier, and 134 jurors were questioned during voir dire. Cf. Taylor, 669 So.2d at 378 (seventy potential jurors examined over eleven days). In this situation, defendant fails to show prejudice, especially since he was not deprived of any peremptory challenges.

Denial of Resources Necessary to Present a Defense
Defendant contends that he was denied, in both phases of the trial, the resources necessary to present his defense.

1. Denial of Audio Expert

Defendant claims that the court erred when it did not provide him with funds to send a videotape of his confession to experts who could have examined it to determine whether the cocking of pistols could be heard while he gave his statement. Defendant unsuccessfully sought review of the court's pre-trial ruling in the court of appeal and in this court. State v. Brumfield, 93-0805 (La.App. 1st Cir.1993), cert. denied, 94-0279 (La.3/25/94); 635 So.2d 245. The denial of a pre-trial application for supervisory writs does not bar consideration on direct appeal. State v. Fontenot, 550 So.2d 179 (La.1989).
Defendant sent the expert $300 to do a preliminary examination of the tape, and the trial court denied additional funds until defendant produced the findings of the expert's initial evaluation. Ultimately, the court did not provide further funds for the expert. Appellate counsel claims that additional prejudice resulted from the court's ruling when the prosecutor referred to the lack of evidenceincluding expert testimony corroborating defendant's claim that police coerced his confession by cocking their weapons.
This court has held that:
[F]or an indigent defendant to be granted the services of an expert at the expense of the state, he must establish that there exists a reasonable probability both that an expert would be of assistance to the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, a defendant must ordinarily establish, with a reasonable degree of specificity, that the assistance is required to answer a substantial issue or question that is raised by the prosecution's case or to support a critical element of the defense.
State v. Touchet, 93-2839, p. 16 (La.9/6/94); 642 So.2d 1213, 1216.
As the court of appeal noted, the interrogation was conducted in a busy environment which allowed the unobstructed transmission of sounds from other areas. At the suppression hearing, an officer described the interrogation room, "There's a door, you know, partitions, walls. There's no ceiling so consequently you can hear a lot of things.... There was business going on. There were telephones ringing. There were secretaries typing. Other detectives were there."
In this situation, the defense never established "with a reasonable degree of specificity" that a videotape expert was required to answer a substantial issue or *676 question "to support a critical element of the defense." Moreover, defendant fails to demonstrate the existence of prejudice resulting from the trial court's denial of funds. See Caldwell v. Mississippi, 472 U.S. 320, 325 n. 1, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (refusing to require state to fund ballistics expert when defendant "offered little more than undeveloped assertions that the requested assistance would be beneficial").
Finally, defendant failed to object to the prosecutor's closing argument that exploited the absence of expert testimony corroborating defendant's claim about the cocking of weapons during his confession. Any claim of error based on prosecutorial misconduct was therefore waived. La.Code Crim. Proc. art. 841; State v. Taylor, 93-2201, p. 7 (La.2/28/96); 669 So.2d 364, 369 (contemporaneous objection rule applies to errors committed at guilt stage of a capital case), cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106(1996).

2. Denial of Expert on Prison Life

Defendant also claims that the court erred when it did not provide funds for a prison life expert. During its initial ruling, the trial court indicated that evidence provided by a prison-life expert would be inadmissible. The court of appeal granted supervisory writs on the issue and ordered the trial court to reconsider its ruling in light of Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), which held that evidence on a defendant's adjustment and good behavior while in prison is within the defendant's right to present all relevant evidence in mitigation. State v. Brumfield, 93-0805 (La.App. 1st Cir.1993). Nonetheless, the trial court did not provide defendant funds for such an expert.
Notwithstanding the Supreme Court's dictate in Skipper, defendant fails to show that the trial court erred in refusing to provide funding for a prison life expert. In fact, when questioned about defendant's prospective adaptation to prison life, social worker Dr. Cecile Guin informed the jury that "in a large group, if it's lots of people, lots of chaos, [defendant] doesn't do well. But if you leave him alone, put him in a, you know, a structure with a controlled environment, then he does much better." Moreover, as discussed below in the section on the exclusion of alleged mitigation evidence, Dr. Guin also testified about defendant's disciplinary record while incarcerated. Under these circumstances, defendant fails to show "a reasonable probability both that an expert would be of assistance to the defense and that the denial of expert assistance [resulted] in a fundamentally unfair trial." Touchet, 642 So.2d at 1216.

3. Unreasonable Interference in Funding Decisions

Defendant argues that the trial court interfered with his right to present mitigating evidence by becoming overly involved in funding decisions. Specifically, he claims that the trial judge, "apparently working to be certain that the fiscal impact was necessary, erroneously took up whether the particular need [for an expert] made sense." However, as we have noted above, the court, in making decisions about public funding for experts for indigent defenders, must determine whether there is a "reasonable probability" that the expert's evidence will materially assist the defense with respect to a substantial issue of the case. See State v. Touchet, 93-2839, pp. 4-6 (La.9/6/94); 642 So.2d 1213, 1216. Accordingly, the trial court must obtain some knowledge of defendant's case in order to make reasonable funding decisions. Moreover, the hearings of defendant's motions for funds were held ex parte; thus, he does not show that any prejudice resulted from the court's knowledge of his case.

Change of Venue
Defendant claims that the trial court erred when it denied his motion for a change of venue based on extensive publicity about the case. Defendant offered into *677 evidence videotapes and news reports about the case. In addition, defendant called the Chief of Police of Baton Rouge at the time of the crime. The Chief testified that this was the first murder of a police officer since he became chief, and that the reaction was widespread and sympathetic to the victim, though the Chief said he had "nothing against which to compare it."
In denying defendant's motion for a change of venue, the court stated:
Well, over the course of the last fourteen days we've interviewed approximately one hundred eighty to a hundred and ninety ... jurors. I attempted to keep some track of the challenges for cause, and while my count is not by any means definitive, I counted somewhere less than twenty of those jurors being excused for reasons of their not only knowledge of the pre-trial publicity, but inability to set aside what they heard about the case and decide[] strictly on the basis of evidence in this courtroom, and that is the test. The test is not that the juror has not heard anything about anything, the question is whether the juror can set aside what he or she has heard in the press, not form any opinions, judge the case strictly upon the evidence that's introduced in the course of the trial. Somewhere less than twenty people out of that hundred eighty or hundred ninety said they couldn't do that. You exercise peremptory challenges for whatever reason, but there was not a single [one] that said that they couldn't do that who was not stricken for cause. So the court feels thatthere is no grounds for the motion for change of venue ... And I have to also take into account the fact that this is some two and a half years past the point that that publicity was broadcast. For all those reasons, your motion for a change of venue will be denied.
A defendant is guaranteed an impartial jury and a fair trial. La. Const. art. I, § 16. Accordingly, the law provides for a change of venue when a defendant establishes that he will be unable to obtain an impartial jury or a fair trial at the place of original venue. State v. Bell, 315 So.2d 307, 309 (La.1975); Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). In unusual circumstances, prejudice against the defendant may be presumed. State v. David, 425 So.2d 1241, 1246 (La.1983). Otherwise, the defendant bears the burden of showing actual prejudice. State v. Vaccaro, 411 So.2d 415 (La. 1982). Whether the defendant has made the requisite showing of actual prejudice is "a question addressed to the trial court's sound discretion which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion." State v. Wilson, 467 So.2d 503, 512 (La. 1985).
"A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind ... a fair and impartial trial cannot be obtained in the parish where the prosecution is pending." La.Code Crim.Proc. art 622. Several factors are pertinent in determining whether actual prejudice exists, including (1) the nature of pretrial publicity and the degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the publicity and the trial; (4) the severity and notoriety of the offense;(5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. State v. Brown, 496 So.2d 261, 263 (La.1986). "The length to which the trial court must go in order to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality." Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). Because a defendant is not entitled to a *678 jury that is entirely ignorant of his case, he cannot meet his burden by merely showing a general level of public awareness of the case. State v. Thompson, 516 So.2d 349, 352 (La.1987); Brown, 496 So.2d at 263.
This court and the Supreme Court have often considered the number of jurors excused for having a fixed opinion as a gauge of whether prejudice exists in the public mind. This case is in line with cases where the courts have not required a change of venue. See, e.g., Murphy, 421 U.S. at 803, 95 S.Ct. 2031 (holding that excusing twenty of seventy-eight venire persons because of opinion of defendant's guilt did not justify venue change); State v. Connolly, 96-1680, p. 5, (La.7/1/97), 700 So.2d 810, 815 (no need for venue change where 120 of 139 potential jurors possessed some knowledge about the crime, but most had only a vague recollection of the surrounding facts); State v. Wilson, 467 So.2d 503, 513 (La.1985) (no grounds for venue change where only four of thirty-nine jurors were excused for having a fixed opinion). In the present circumstances, defendant's claim about a change of venue does not present reversible error.

Curtailment of Voir Dire
Defendant claims that the court improperly restricted his questioning during voir dire.
First, he complains that the court did not allow him to question juror Terry Teekell concerning his ability to judge defendant's guilt on the evidence presented at trial. Defendant asked Teekell if he could ignore news reports he had seen which led him to believe that "these people are guilty." Teekell ultimately answered that exposure to the news reports would not influence his decision. The defense then asked "how" Teekell would be able to set those things aside. The prosecutor objected, and the court sustained the objection. Defendant later challenged the juror for cause, and the court denied the challenge.
Defendant also complains about an instance when the court required his counsel to change topics while questioning prospective juror Mary Binning. The court had determined that defense counsel had already asked about Binning's alleged predisposition to return a death verdict and concluded that defense counsel was confusing her. Defense counsel first asked Binning if she would "automatically" vote for the death penalty if defendant were found guilty of first degree murder. When Binning answered affirmatively, defense counsel asked if she would still return a death verdict "regardless of information ... offer[ed] in mitigation," and she answered, "No." When defense counsel sought to clarify a perceived contradiction in her responses, Binning said she was confused by the question. The court then rephrased the question, explaining:
The law requires that you as a juror before the death penalty can be returned you have to be convinced of the existence of an aggravating, at least one aggravating circumstance, and you are required to consider all of the mitigating circumstances, you then reach your determination as to what the appropriate sentence will be in this case. Can you do that ma`am?
Binning said, "Yes." Defense counsel nonetheless continued to pursue the issue, so the court called counsel to the bench and said:
All right. That's the third time you've asked that to that juror. You asked it to the other juror four times. It's a confusing question. The lady was confused the first time. I let you ask her three separate times before I stepped in and stated it the way the law provides. She has answered that question. Move on to something else. I'll note your objection.
Defense counsel later challenged Ms. Binning for cause, and the court denied the challenge, noting that when asked *679 about a death verdict "in a manner in which the law states it, and in a nonmisleading manner, she responded properly."
Defendant also complains about the sustaining of the prosecutor's objection to questions to prospective juror Bahr (discussed above in the context of cause challenges.) The defense asked if Bahr would "automatically" vote to impose the death penalty absent mitigating circumstances, and the prosecutor objected on grounds that the question presupposed a set of facts. The court sustained four prosecution objections to essentially the same question and ultimately denied defense counsel's cause challenge of Bahr.
La. Const. art. I, § 17 guarantees a defendant full voir dire examination of prospective jurors and the right to challenge jurors peremptorily. The purpose of voir dire is to determine qualifications of prospective jurors by testing their competency and impartiality in order to discover bases for challenges for cause and for the intelligent exercise of peremptory challenges. State v. Hall, 616 So.2d 664, 668 (La.1993). The scope of examination rests within the sound discretion of the court, and its ruling will not be disturbed absent clear abuse. La.Code Crim.Proc. art. 786; Hall, 616 So.2d at 669. In determining whether the trial court afforded a sufficiently wide latitude to the defendant, the court must consider the entire voir dire examination. La.Code Crim.Proc. art. 786; Hall, 616 So.2d at 669.
Here, the trial court did not prevent defense counsel from ascertaining prospective jurors' qualifications nor cause him to exercise peremptory challenges haphazardly. Teekell indicated that he would not let the media coverage influence his verdict. Binning, when asked in an unambiguous fashion, said she could consider both a verdict of death and life imprisonment and consider both aggravating and mitigating circumstances. Likewise, Bahr demonstrated that he could consider verdicts of both death and life imprisonment. In these circumstances, defendant fails to show that the court abused its discretion when it curtailed the voir dire questioning in certain instances in order to clarify issues for the prospective jurors. La.Code Crim.Proc. art. 786; Hall, 616 So.2d at 669.

Discovery Violation
Defendant claims that the court erred when it did not order the prosecutor to turn over statements made by Eddie Paul, who was allegedly described as one of the perpetrators in an affidavit of probable cause. In response to the motion to produce the statement, the prosecutor contended that Eddie Paul's involvement in the crime was that of a material witness, rather than a principal, and thus that defendant was not entitled to his statements. The record contains no transcription of the court's discovery ruling,[1] although there is a copy of the court of appeal's denial of defendant's application for supervisory writs. State v. Brumfield, 93-1527 (La. App. 1st Cir.8/23/93) (noting in dicta that Eddie Paul was not a codefendant).
La.Code Crim.Proc. art. 722 provides in part that the prosecutor must make available "any relevant written or recorded confessions or inculpatory statements made by a codefendant...." When deciding whether a defendant is entitled to a witness's statements, the court should focus on the question of when co-participants in a crime become "co-defendants" for purposes of Article 722. See State v. Kimble, 375 So.2d 924 (La.1979) (uncharged co-participant not a codefendant for purposes of Article 722); State v. Fleming, 574 So.2d 486 (La.App. 4th Cir.1991), cert. denied, 592 So.2d 1313 (La.1992) (murder defendants not entitled to statements made by witnesses during pretrial discussions because witnesses were not indicted *680 for first-degree murder and thus were not codefendants).
According to a detective's trial testimony, Eddie Paul was originally arrested for the crime, but was soon released. The detective further testified that Eddie Paul remained in police custody voluntarily before defendant's arrest for his own protection. In any event, defendant concedes in his brief he is not entitled to pre-trial statements made by Eddie Paul, stating "the Kimble rule is subject to abuse by prosecutors who may simply chose [sic] not to indict a co-conspirator witness in the principal crime in order to protect prior statements from discovery. This is a bad policy which the Court should change." See Kimble, 375 So.2d at 929-30.
Given his concession as to the state of the law, defendant does not show entitlement to Eddie Paul's statements. Further, defendant fails to show prejudice resulting from the prosecutor's failure to provide the statements. See State v. Bourque, 92-0968 (La.7/1/93); 622 So.2d 198, 239 (before being entitled to relief, defendant must show prejudice resulting from the prosecutor's failure to comply with discovery procedure); State v. Schrader, 518 So.2d 1024, 1031-32 (La.1988).[2]

Motion to Suppress
Defendant claims that the trial court erred in sustaining the prosecutor's objection when he tried to impeach the credibility of the police at the suppression hearing. He also claims that the court erred when it ruled his confession admissible.

1. Curtailed Impeachment

A Baton Rouge police sergeant testified on direct examination by the prosecutor that he monitored the interrogation of defendant, that he observed no one threaten, coerce or physically intimidate defendant, and that the interrogating officers did not display their weapons, apply any physical pressure to defendant or use any plastic or paper bags as a means of forcing defendant to answer questions.
On cross-examination, defense counsel asked the sergeant about alleged improprieties which took place some years earlier when officers interrogated suspects during the investigation of the murder of a police officer. The prosecutor objected, claiming that any alleged improprieties in an unrelated investigation years earlier were not relevant to defendant's present claim. The court sustained the objection, stating, "What was done in prior cases is not relevant to what was done in this case."
The prior record of misconduct by one police officer has no relevance when the defendant alleges mistreatment by another officer. State v. Floyd, 435 So.2d 992, 995 (La.1983). Here, defendant provides no suggestion that any of the officers who participated in his arrest and interrogation had previously engaged in any acts of misconduct. Thus he fails to demonstrate that the court erred when it did not allow the defense to pursue that line of questioning which would have possessed little relevance to defendant's claims of abuse.

2. Defendant's Confessions

Defendant argues that the court should have suppressed his two videotaped confessions that allegedly were coerced.
The police arrested defendant pursuant to a warrant on January 11, 1993. When the police approached him, defendant discarded a loaded handgun and called to an officer that he knew, "Don't let them kill me, Browning." Defendant was handcuffed, advised of his Miranda rights, and taken to the narcotics office for questioning.
*681 When first questioned at the narcotics office, defendant denied any knowledge of the murder. A detective then asked defendant, hypothetically, his theory of the crime. Defendant responded that it was a deal that "went bad." Defendant speculated that the perpetrators had used .25, .32 and .380 caliber weapons. When asked the best way to commit the crime, defendant responded, "hide, wait, have their guns out ready." The detective testified that defendant's "theory" of the crime matched details which had not been released to the public.
Based on these responses, the detective asked defendant if he had been personally involved in the crime. Defendant claimed that he was at his brother's place of employment at four different times the night of the crime. Officers then spoke with defendant's brother, who disagreed with defendant's alibi. The officers confronted defendant with his brother's account, and defendant admitted personal involvement in the crime.[3]
Defendant next tried to minimize his involvement in the crime, claiming he had parked the car down the street while his two accomplices committed the robbery and murder. Defendant agreed to give a videotaped statement about the crime, and a detective again read him the Miranda warnings. The videotaped interview began at 12:58 a.m. and concluded at 1:48 a.m. During the statement, defendant maintained that he accompanied Henri Broadway and West Paul to do a "hustle," which he explained normally meant committing a robbery. He claimed he had no knowledge that the two intended to rob the victims on their way to the bank with the night deposit. Defendant also stated that he went to the victim's funeral because he felt remorse for the crime.
After defendant gave his first videotaped statement, he identified Broadway from a mug shot. Police arrested Broadway and West Paul, and took them into custody. Both men asserted that defendant was the one who shot the victim. Officers took all three codefendants to another police station. Between 10:30 a.m. and 11:00 a.m., police advised defendant that both West Paul and Broadway implicated him as the shooter. Further, the layout of the interrogation rooms permitted defendant, and his girlfriend who then accompanied him, to overhear West Paul assert in his statement that defendant was the shooter. According to the detective, defendant became emotionalstriking the walls and abusing a chairwhen he found out that Broadway and West Paul identified him as the shooter and when his girlfriend learned that he had been accused of shooting the victim.
Defendant then admitted that he indeed shot the victim and agreed to make another videotaped statement. A detective again advised defendant of his Miranda rights, and defendant gave his second videotaped confession. The detective testified that defendant appeared "mentally well and alert" when he gave the statement and that he did not request an attorney.
The second videotaped interview began at 2:18 p.m. on January 12, 1993 and concluded at 2:45 p.m. During this confession, defendant admitted ambushing the victims and stated he planned the robbery because he knew from "riding around" when the night deposit would be made. He claimed he and Broadway hid in the bushes surrounding the bank for about fifteen minutes before the marked police vehicle arrived. He also stated he saw that the deceased victim was in uniform when he fired at the vehicle.
Defendant claimed that interrogating officers first hit him in the stomach with a *682 flashlight and slapped him in the face. Defendant stated that after the officers told him that his codefendants had confessed, "they started beating me, you know, grabbing me, throwing me against the wall, dragging me on the floor and stuff." He also asserted that an officer placed a gun in his mouth before he gave the second statement. As to the first statement that he was merely the getaway driver, defendant testified that two officers stood behind the camera with flash cards, prompting defendant to make the incriminating statements. Defendant concluded by stating that he would not have given the statements if the officers had not beaten and threatened him.
At the suppression hearing, the chief indigent defender testified that he visited defendant in parish prison shortly after his arrest and that defendant showed him some fresh abrasions on his legs. On cross-examination, the attorney stated he did not find defendant's condition warranted medical attention and that he did not document the injuries.
Codefendant Henri Broadway claimed he overheard defendant screaming and hollering for his lawyer and requesting that his girlfriend contact an attorney for him. On cross-examination, Broadway claimed he heard the commotion occurring in defendant's interrogation room between 2:00 p.m. and 3:00 p.m. When informed by the prosecutor that defendant gave his second videotaped statement at 2:15 p.m., Broadway stated that his estimation of the time may have been incorrect because there was no clock in the room.
Defendant's girlfriend claimed she was present and heard defendant screaming to her from the interrogation room to call his attorney. Officers later let her see defendant, and he told her that he didn't do it and that the detectives made him confess. She stated that she was his girlfriend at the time of defendant's arrest, and had since given birth to their child. She also testified that she had broken up with defendant between six months and a year before the suppression hearing.
On cross-examination, the girlfriend stated that she did not remember defendant's telling her that anyone had hit him with a flashlight, stuck a gun in his mouth, thrown him against a wall or dragged him across the floor. She also stated that defendant did not tell her that officers had struck him in the face.
The videotapes show no signs of coercion, inducements or threats. As to defendant's claim that the sound of a pistol cocking could be heard during this statement, there is considerable background noise on the tape. Defendant himself, when cross-examined, became very flustered and confused when questioned about who beat him before he gave his second videotaped statement
The prosecutor then asked defendant if he had also claimed that his confession regarding the armed robbery in Clinton had been coerced. Defendant stated that he made that claim because the interrogating officer in that case had squeezed the skin on his wrists with handcuffs. He also admitted that he previously told his attorney that the Clinton officer had threatened him with, a gun when interrogating him at parish prison. The prosecutor then asked defendant if he had later learned that guns were not allowed in the prison, and defendant maintained that the officer had a gun.
Numerous police officers testified about defendant's interrogation and confession. While there may have been some slight inconsistency as to whether a particular officer wore his gun during part of the interrogation, all the witnesses consistently and specifically denied defendant's allegations. They asserted that no threats or force ever were applied to defendant and no weapons were brandished.
Both the prosecutor and the defense rested subject to the stipulation that the court would reopen the matter if the defense produced new and relevant witnesses. The parties then submitted the *683 matter without argument. The court eventually denied the motion to suppress, "[b]ased on the testimony ... heard over these past months and particularly this last week, [and] the physical items introduced into evidence."
Before introducing a confession into evidence, the prosecutor must show affirmatively that the statement was free and voluntary, and not the result of fear, duress, intimidation, menace, threats, inducements or promises. La.Rev.Stat. 15:451; State v. Simmons, 443 So.2d 512 (La.1983). The prosecutor must expressly rebut a defendant's specific allegations of misconduct. State v. Vessell, 450 So.2d 938, 942-43 (La.1984). Credibility determinations lie within the sound discretion of the trial court, and the ruling should not be disturbed unless clearly contrary to the evidence. Vessell, 450 So.2d at 943. In reviewing a trial court's judgment denying a motion to suppress, an appellate court is not limited to the evidence adduced at the hearing on that motion, but may consider all pertinent evidence given at trial. State v. Green, 94-0887, p. 11 (La.5/22/95); 655 So.2d 272, 280.
In the instant case, each officer present with defendant during the various interrogations testified that no coercion had been employed when obtaining defendant's statements. Moreover, a review of the first videotaped confession, in which defendant claimed his answers were prompted by the use of flash cards, does not suggest that defendant was reading when he gave his responses to questions during the interrogation. Similarly, as to defendant's claims that a gun was pointed at him during the second videotaped interrogation and that the weapon was cocked at one point, a review of the tape reveals only that there was background noise during the interview. In any event, at no point can defendant be seen reacting to any alleged threats. Finally, defendant's testimony at the hearing contained numerous inconsistencies. Consequently, defendant fails to show that the trial court's determination is not entitled to deference, and there is no basis for overturning the denial of the motion to suppress.

TRIAL ISSUES

Sufficiency of Evidence That Victim Was a Peace Officer Engaged in the Performance of Her Lawful Duties
Defendant claims that the prosecutor presented insufficient evidence that the victim was a peace officer engaged in the performance of her "lawful duties," as required by the capital murder statute. The statute reads in part:
A. First degree murder is the killing of a human being:
. . .
(2) When the offender has a specific intent to kill or to inflict great bodily harm upon a fireman or peace officer engaged in the performance of his lawful duties.
La.Rev.Stat. 14:30A(2). Defendant contends that because the evidence presented at trial demonstrated that the victim had in fact finished her shift on the force and was employed on paid security detail at the time of the crime, the prosecutor failed to prove the "lawful duties" element of the offense.
This court has addressed this argument once before. In State v. Berry, 391 So.2d 406 (La.1980), the defendant entered a bank to commit a robbery. He shot a uniformed police officer who was working a security detail. The victim was off duty when he died, but he had "just as other deputy sheriffs often do ... volunteered for this detail, drawing extra pay from the bank." Id. at 412. Although conceding that "[i]t might be said that [the victim] was "moonlighting," the court had little difficulty in finding that "[w]hatever the nature of the deputy's general activities at the bank in the context of the question whether he was engaged in his lawful dutiesit was surely within the scope of his lawful duties as a deputy sheriff for *684 him to try to prevent an armed robbery in his presence." Id.
This court decided Berry before the Legislature amended La.Rev.Stat. 14:30B in 1993 to adopt the following definition of a police officer, as found in La.Rev.Stat. 40:2402:
"any full-time employee of the state, a municipality, a sheriff, or other public agency, whose permanent duties actually include the making of arrests, the performing of searches and seizures, or the execution of criminal warrants, and is responsible for the prevention or detection of crime or for the enforcement of the penal, traffic, or highway laws of this state. ..." (emphasis added).
This definition underscores this court's holding in Berry that a police officer undertaking a security detail to protect the citizens of this state and to prevent or deter the commission of violent crime, whether paid from the public fisc or from private sources, is performing "lawful duties" for purposes of La.Rev.Stat. 14:30A(2). Accordingly, La.Rev.Stat. 14:30A(2) encompassed the victim in this case as she performed her lawful responsibilities by providing a security escort for a store manager on her way to the bank with the day's proceeds.
In any event, the failure of one statutory aggravating circumstance found by the jury to support a death sentence would not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceedings. State v. Byrne, 483 So.2d 564, 575 (La.1986); see also Zant v. Stephens, 462 U.S. 862, 884, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (noting that under most circumstances "a death sentence supported by at least one valid aggravating circumstance need not be set aside ... simply because another aggravating circumstance is `invalid' in the sense that it is insufficient by itself to support the death penalty."). In this case, the prosecutor proceeded with the first degree murder charge based on three circumstances: (1) defendant intended to kill the victim during the perpetration of an attempted armed robbery; (2) the victim was a peace officer engaged in her lawful duties; and (3) defendant knowingly created a risk of death or great bodily to harm to more than one person. During the penalty phase, the jury unanimously found as aggravating circumstances all three elements. Accordingly, the jury's verdict at the sentencing stage would have survived any insufficiency of evidence that the victim was a peace officer engaged in the performance of her lawful duties. Finally, evidence of the victim's status did not inject any arbitrary factor into the penalty phase because that evidence was properly and inevitably admitted in the guilt phase. State v. Byrne, 483 So.2d 564, 575 (La. 1986).

Reasonable Doubt Instruction
Defendant claims that the court gave an erroneous instruction on reasonable doubt to the jury at the close of the guilt phase of the trial.[4]
*685 The same trial judge gave the same instruction in State v. Williams, 96-1023 (La.1/21/98), p. 15, n. 9; 708 So.2d 703, 716, n. 9. This court approved of the instruction, noting that while it did not follow the charge proposed in the Louisiana Judges' Criminal Bench Book, it did not equate substantial doubt with grave uncertainty as did the instruction in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). See Williams, 708 So.2d at 717. Moreover, the court in Williams noted that an instruction which equated reasonable doubt with "a serious doubt for which you could give good reason" passed constitutional muster. Williams, 708 So.2d at 718 (citing State v. Smith, 91-0749 (La.5/23/94); 637 So.2d 398).

PENALTY PHASE ISSUES

Victim-Impact Evidence
Defendant claims that the prosecutor introduced impermissible victim-impact testimony during the penalty phase and made improper references about the victim during closing argument.
During the penalty phase, the prosecutor asked the victim's son, "If you could say anything more to your mom, what would you want her to know?" The son responded, "I guess we're making it. There's not a day that goes by that we don't think about her. And of course, I want her to come and see me play [football] or just to be back here so I could talk to her."
During closing arguments, the prosecutor spoke of the victim's qualities when arguing that the jury should return a death verdict:
[The victim] instilled in her children the fact that you don't have to commit crimes, you don't have to be criminals to live in society. She tried to put those good values, those just decent values, even though there were six children there and she was obviously struggling, working very hard, working at least two jobs all the time to make ends meet and she found time to go out and to coach those children, coach other people's children. She found time for other people. That was just the kind of person that [the victim] was and those values have obviously been instilled in her children. And when you kill that type of person who goes about every day working for us, that is truly a public servant, ladies and gentlemen, I submit to you that is one of the worst forms of murder, if not the very worst form that can occur in our society, particularly the very violent society that we live in the United States in the 1990's.
Two broad categories of victim-impact evidence are admissible: (1) information revealing the individuality of the victim, and (2) information revealing the impact of the crime on the victim's survivors. Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); State v. Bernard, 608 So.2d 966 (La.1992). Thus while some evidence depicting the impact of the loss on the victim's survivors is permissible, the evidence may not stray into detailed descriptions of the good qualities of the victim, particularized narrations of the sufferings of the survivors, or the opinions the survivors hold with respect to the crime or the murderer. Bernard, 608 So.2d at 972.
Neither the evidence nor the argument in this case violates the parameters for victim-impact evidence set out in Bernard. The son's testimony described in a general fashion the impact that his mother's death had on his family. That type of evidence has been held admissible in the sentencing phase of a capital trial by both this court and the Supreme Court. Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); Bernard, 608 So.2d at 972. Moreover, the prosecutor presented only three victim-impact witnesses at the *686 penalty phase: the victim's mother and two of her children. Their combined testimony, totaling only nine pages of transcript, consisted mainly of a description of the victim and the impact of her death on the survivors, but only in the most general terms.
Similarly, the prosecutor's closing argument did not descend into a detailed description of the victim, but rather made only general observations indicating that she had been a hard-working and responsible provider to her children. Moreover, the portion of the closing argument suggesting that the victim's occupation as a police officer made defendant more worthy of death could hardly have injected an arbitrary factor into the proceedings, because the capital sentencing scheme required the jury to find that status before it could return a death verdict.

Prosecutor's Failure to Disclose Exculpatory Evidence
Defendant claims that the prosecutor withheld exculpatory evidence regarding the 1989 murder at the direction of a drug dealer. Defendant was not prosecuted for the crime and gave conflicting accounts regarding his involvement. As a result, the prosecutor in this case presented no evidence about it during its case-in-chief in the penalty phase. However, in order to impeach one expert's report indicating that defendant only witnessed the crime, the prosecutor later introduced another expert's report in which defendant evidently admitted shooting at the victim.
Appellate counsel argues "[o]n information and belief" that the prosecutor withheld exculpatory information about the crime "while arguing in direct contradiction to it." Consequently, he contends that the prosecutor violated the rule set out in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. However, defendant provides absolutely no factual support to bolster his claim that the prosecutor possessed any exculpatory evidence. The simple fact that the prosecutor did not introduce evidence about the 1989 incident does not show that the prosecutor possessed exculpatory evidence regarding that crime.

Exclusion of Mitigation Evidence in the Penalty Phase
Defendant claims that the trial court erred when it prevented him from presenting certain mitigation evidence in the penalty phase.
As discussed above, at a hearing seeking funds for an expert on prison life, the court initially stated that testimony from the expert would not be admissible during the penalty phase. Later during the hearing, the court clarified that it would limit defendant to evidence of the mitigating circumstances in La.Code Crim.Proc. art. 905.5. The court ultimately refused to provide funds for the expert, and the defendant objected for the record.
During the penalty phase, defendant presented testimony from an expert social worker, Dr. Cecile Guin, who testified about the decreasing number of incidents for which defendant had been disciplined since his incarceration. She explained that when defendant is "in a large group, if it's lots of people, lots of chaos, he doesn't do well. But if you leave him alone, put him in a, you know, a structure with a controlled environment, then he does much better." The defense then asked if defendant could "adequately function in a structured environment such as prison?" The court sustained the prosecutor's objection to the question.
Both this court and the Supreme Court have repeatedly stressed that a capital defendant has the right to introduce virtually any evidence in mitigation during the penalty phase of a capital trial. Lockett v. Ohio, 438 U.S. 586, 605-606, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); State ex rel. Busby v. Butler, 538 So.2d 164 (La.1988). That evidence includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the *687 defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604, 98 S.Ct. 2954 (emphasis added). "The nature of the penalty phase at a capital trial indicates the importance of the jury receiving adequate and accurate information regarding the defendant. Without such information, a jury cannot make the life or death decision in a rational and individualized manner." Busby, 538 So.2d at 169 (citing Tyler v. Kemp, 755 F.2d 741, 745 ( 11th Cir.1985)). See also Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (barring evidence on defendant's good behavior while in prison violates his right to present all relevant mitigation evidence); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (refusal to consider family history and childhood abuse of sixteen-year-old defendant facing the death penalty violates Eighth Amendment). Mitigation evidence bearing on the "life or death" sentencing decision is, of necessity, crucial. See State v. Weiland, 505 So.2d 702 (La. 1987) (conviction and sentence reversed for erroneous exclusion of "crucial mitigating evidence"). The Due Process Clause does not allow the execution of a person "on the basis of information which he had no opportunity to deny or explain." Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (death penalty could not be imposed on basis of confidential information not disclosed to the defense).
Defendant relies on the Skipper decision and argues that "defendant's behavior and adaptability to prison life is not to be excluded as `irrelevant.'" In Skipper, a capital defendant was barred from presenting the testimony of two jailers and one "regular visitor" to the effect that he had made a "good adjustment" during his time spent in jail. Skipper, 476 U.S. at 3, 106 S.Ct. 1669. The defendant and his wife had already testified that defendant had conducted himself well while incarcerated; however, the Court concluded that this evidence was "the sort of evidence that a jury naturally would tend to discount as self-serving. The testimony of more disinterested witnessesand, in particular, of jailers who would have had no particular reason to be favorably predisposed toward one of their chargeswould quite naturally be given much greater weight by the jury." Skipper, 476 U.S. at 8, 106 S.Ct. 1669. The Court reversed the death sentence and held that the exclusion of "relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender." Id.
The instant situation is distinguishable from that in Skipper. First, defendant did, in fact, present evidence which revealed that his behavior while incarcerated had shown improvement. In addition, despite a sustained prosecution objection, defendant's expert was able to testify that defendant "does much better" in "a structure with a controlled environment." Under these circumstances, even if the court erred when it sustained the prosecutor's objection, the error did not prevent the jury from considering defendant's ability to adapt to prison life, nor did it introduce an arbitrary factor into the jury's deliberations during the sentencing phase.

Joint Funding of District Attorney and District Court
Defendant argues that the current scheme under which district attorneys and district judges share the financial resources of the Criminal Court Fund violates separation of powers principles. Specifically, defendant contends that the scheme set out by La.Rev.Stat. 15:571.11 provides the district attorney with authority over the financing of the district court.
However, as discussed above, defendant fails to show that the scheme denied him any funding for experts or investigators to which he was entitled and thus does not show any prejudice resulting from the existing funding scheme. Cf. State v. Conger, 483 So.2d 1100, 1103 (La.App. 4th Cir.), cert. denied, 488 So.2d 199 *688 (La.1986) (relief not warranted when defendant fails to show prejudice resulting from alleged prosecutorial atmosphere created by statute allowing prosecutor to collect fines paid to Criminal District Court). Moreover, the salaries of the judges are fixed by law and annually appropriated by the Legislature so that the judiciary had no vested interest in the outcome of defendant's case. See La.Rev.Stat. 13:102 (salaries of Supreme Court justices); La.Rev. Stat. 13:311 (salaries of appellate judges); La.Rev.Stat. 13:691 (salaries of district court judges). Cf Augustus v. Roemer, 771 F.Supp. 1458, 1473 (E.D.La.1991) (if judges impose fines they will spend, system offends Due Process clause) (citing Ward v. Village of Monroeville, Ohio, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972); Tumey v. Ohio, 273 U.S. 510, 534, 47 S.Ct. 437, 71 L.Ed. 749 (1927)). Finally, "despite the requirement of approval by both the district court and the district attorney, `neither agency of government may arbitrarily refuse to approve a proper expenditure from [the Criminal Court Fund].'" State v. Craig, 93-2525, p. 6 (La.5/23/94); 637 So.2d 437, 442 (quoting State v. Henderson, So.2d 341 So.2d 879, 882 (La. 1977)). In these circumstances, defendant fails to show any violation of separation of powers principles.
NOTES
[*] Marcus, J., not on panel. Rule IV, Part 2, § 3.
[1] Defendant's other assignments of error involve only settled principles of law and are treated in an unpublished appendix, which is attached to this opinion and is part of the official record.
[2] The incident had not been mentioned by Dr. Guin on direct examination.
[3] In the trial of the armed robbery committed by defendant in Clinton, the officer testified that defendant freely admitted the crime the day of the event, but later claimed involuntariness based on coercion.
[4] Because the store manager did not identify defendant, but only identified a co-assailant, defense counsel may have made a strategic choice not to object to the hypnosis-refreshed identification. This issue perhaps would be more appropriately addressed in post-conviction proceedings.
[5] Article 607C was not intended to change Louisiana law, and reference to a prior decision is therefore warranted. La.Code Evid. art. 607, Official Comment.
[6] That contention is rejected in the appendix. See La.Rev.Stat. 14:30 B; La.Rev.Stat. 40:2402; State v. Berry, 391 So.2d at 406 (La.1980).
[1] Neither defense counsel nor the prosecutor cites to a hearing on the discovery. The minutes indicate that the court ruled the prosecutor's answers sufficient on March 29, 1993.
[2] The prosecutor provided defense counsel with at least one of Eddie Paul's statements, as shown by the cross-examination of the witness during which defense counsel read into the record a statement that Paul had given to the police.
[3] Defendant's admission of involvement in the offense occurred about 11:30 p.m., about five hours after the beginning of the interrogation.
[4] The relevant portion of the final charge reads:

Now, while the state must prove guilt beyond a reasonable doubt, it does not have to prove guilt beyond all possible doubt. Reasonable doubt is doubt based on reason and common sense. And it's present when after you've carefully considered all of the evidence you cannot say that you are firmly convinced of the truth of the charge. As to reasonable doubt, it's not a mere slight misgiving or a possible doubt. You may say that it's self-defining. It's a doubt that a reasonable person could seriously entertain. It's a serious and sensible doubt. It's a doubt that you could give a good reason for. And while it's true that the state must prove the guilt of the accused beyond a reasonable doubt, this does not mean that the state has to prove the guilt of the accused to one hundred percent perfection, or to an absolute certainty. That's because the law recognizes that human nature being what it is, all human endeavors will fall short of perfection. Therefore, it is sufficient if after a full consideration of all the evidence, if [sic] you're honestly convinced from that evidence that the accused is guilty beyond a reasonable doubt. (emphasis added.)